## STORM v. ELDRIDGE.

1. TAXATION—SCAVENGER ACT—LAST OWNERS—MATCHING BID.
   The last owner of title before the State acquired title for tax delinquency had the right to bid and meet the bid at a scavenger sale as the scavenger act stood in 1939 (PA 1937, No 155, as amended by PA 1939, No 244).

2. APPEAL AND ERROR—QUESTIONS REVIEWABLE—ATTORNEY—REAL ESTATE BROKER—STATUTE OF FRAUDS—PURCHASE OF REAL ESTATE.
   Question as to whether the statute of frauds applies to real estate brokers employed to purchase but not to sell real estate is not discussed on defendant's appeal from verdict and judgment for plaintiff who was both an attorney and a real estate broker at the time of rendering services for which he sought to recover from defendant as an attorney.

3. ATTORNEY AND CLIENT—CONTRACT—COLLECTION FOR SERVICES RENDERED.
   An attorney for a person interested in purchasing a tract of real estate occupies a position of trust and may not properly attempt to collect a sum greater than had been agreed upon for services to be rendered in negotiating the purchase of such real estate.

4. SAME—CONTRACT FOR SERVICES—EVIDENCE.
   Action by attorney for services rendered, brought against an individual defendant and 2 corporations, was properly dismissed

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 51 Am Jur, Taxation §§ 1053, 1054.
[2, 5, 6] 3 Am Jur, Appeal and Error § 820.
[3, 8] 5 Am Jur, Attorneys at Law § 169.
[3, 8] Construction of contract as regards services contemplated where attorney claims compensation in addition to amount named therein. 2 ALR 844.
  Amount of attorney's compensation (in absence of contract or statute fixing amount). 143 ALR 672.
[4] 53 Am Jur, Trial § 318 et seq.
[5, 10] 39 Am Jur, New Trial § 23.
[6-8] 2 Am Jur, Agency §§ 404, 414.
[8] 2 Am Jur, Agency §§ 269, 270.
[10] 3 Am Jur, Appeal and Error § 1226.

as to the corporate defendants, where there was insufficient testimony to show any liability on their part.

5. APPEAL AND ERROR—QUESTIONS REVIEWABLE—INTEREST—NEW TRIAL.

Trial court's disallowance of interest on claim of attorney for services rendered is not discussed, where cause is remanded for a limited new trial.

6. SAME—QUESTIONS REVIEWABLE—PRINCIPAL AND AGENT—PARTIAL-LY-DISCLOSED PRINCIPAL.

Defendant's claim of immunity from personal liability for services rendered by plaintiff attorney *held,* not tenable, where such matter was first raised on motion for new trial, hence, was not submitted to jury, and there is sufficient testimony to show he was not only personally interested but also personally liable as an agent for only partially-disclosed principals.

7. PRINCIPAL AND AGENT—ATTORNEY AND CLIENT.

Defendant in action by attorney for services rendered was personally liable, where he so acted that codefendant corporations could not be bound as principals.

8. ATTORNEY AND CLIENT—FIDUCIARIES—DISCLOSURE TO CLIENT.

An attorney who was engaged to purchase one tract of real estate for defendant had obligation to disclose to defendant the opportunity or necessity of purchasing an adjoining tract as part of his disclosure of all facts to his client and not to take advantage of the fiduciary or trust relationship that arose in connection with the purchase of the first tract, hence, recovery by attorney may not be had for services rendered in connection with purchase of the adjoining tract, a purchase which defendant never consummated.

9. APPEAL AND ERROR—INSTRUCTIONS—EVIDENCE.

Trial judge's instruction that plaintiff attorney's demand for $6,000 as his fee for purchase of tract of land was simply a counteroffer *held,* reversible error necessitating a new trial, where plaintiff had simply demanded $6,000 without having made a counteroffer, such instruction as to counteroffer being unsupported by testimony.

10. SAME—ERRONEOUS INSTRUCTION—LIMITED NEW TRIAL—DAMAGES.

New trial, limited to question of whether defendant as a client waived defense of fraud and duplicity on part of plaintiff attorney by instructing him to continue his efforts in procuring

purchase of a particular tract of land and telling him he would be paid for his services after learning of plaintiff's duplicitous conduct and, if not waived, whether plaintiff was entitled to recover the reasonable value of his services for what he did at defendant's request after latter learned of plaintiff's improper conduct, recovery in any event to be limited to amount claimed for services in connection with such particular tract, is ordered, where there was a reversible error in instruction given jury relative to amount plaintiff might recover.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted January 14, 1953. (Docket No. 60, Calendar No. 45,578.) Decided April 13, 1953. Rehearing denied June 8, 1953.

Action by Arthur S. Storm against James Swan Eldridge and others for attorney's fee. Directed verdict for codefendants. Verdict and judgment against James Swan Eldridge. Defendant appeals. Plaintiff cross-appeals. Reversed and new trial granted.

*Shapero & Shapero,* for plaintiff.

*Corliss, Leete & Moody* (*Dickinson, Wright, Davis, McKean & Cudlip,* of counsel), for defendants.

BUTZEL, J. Arthur S. Storm, plaintiff, formerly of Detroit, had been admitted to the State Bar of Michigan in 1933. Evidently he had a very small practice as he did not have his name on the door where he had his office in the office of another attorney. He did not even have an attorney's letterhead and at the trial was unable to recall whether or not he had been listed as a lawyer in the Detroit telephone directory at the time of the complicated transaction herein set forth. He was also a duly-licensed and active real

estate broker and had been engaged in the real estate business for a long period prior to his admission to the bar. He was in the army almost continuously from 1940 to 1945, and in January, 1946, he ceased to be a resident of Michigan. The latter factors may in part account for the long delay in bringing this action, which arises out of events that took place in 1939 and the early part of 1940. However, the case did not reach trial until March of 1951; the record on appeal was not filed until August 20, 1952, and appellees' brief was not received until January 9, 1953. The memories of witnesses may readily become dim as to details of transactions over 12 years old. A large part of the delay in the present case seems inexcusable.

Plaintiff claims that prior to 1939, as a real estate broker he had an unsatisfactory business experience with defendant James Swan Eldridge, who is also a member of the bar and one of several attorneys whom plaintiff had employed while actively engaged in the real estate business. In the earlier transaction plaintiff claims he had been employed as a real estate broker by defendant to purchase a parcel of property at a certain price, but no agreement was reached and plaintiff was not paid for his services. There was no written contract with him as a real estate broker.

Defendant was actively interested in the Forest Lawn Cemetery Company and Roseland Park Cemetery Association, codefendants herein. Plaintiff claims that because of his previous unprofitable experience with defendant, he insisted that the services now in controversy should be performed by him in the capacity of an attorney and not as a real estate broker, and this action is brought solely to recover for legal services.

Plaintiff testified that defendant asked him to acquire for him, or for others only partially disclosed or decided upon, a 38.3-acre tract of land located in the northeastern part of Detroit, and immediately north of the cemetery of codefendant Forest Lawn Cemetery Company. The association between defendant and the 2 codefendants was a close one, they having adjoining offices in a Detroit office building. Defendant was a director of each of them, president of 1 and resident agent of the other. At the time of the first discussion between plaintiff and defendant in regard to the acquisition of the 38.3 acres, the latter was undecided in whose name he wanted to take title to the property. He mentioned both codefendants, his brother and himself. Plaintiff claims that defendant stated that plaintiff might obtain the option to purchase the land in his own name; that he told plaintiff of earlier efforts to purchase the property but the price of $2,000 per acre asked was unsatisfactory; that he and his associates desired to acquire the property for $1,000 an acre, or less, and that because of the previous unsuccessful negotiation that neither defendant's name nor that of the codefendants was to be disclosed to the owner. Plaintiff claims that it was agreed between defendant and himself that he was to be paid an attorney fee, the amount to be contingent upon his success in acquiring the property for a price of less than $1,000 an acre.

The taxes against the lots into which the property had been subdivided had been unpaid for 11 years and aggregated a very large amount in excess of the value of the property. However, the State had acquired title to the property at tax sale and it was to be offered for sale in accordance with the scavenger act, CL 1948, § 211.351 *et seq.* (Stat Ann 1950 Rev § 7.951 *et seq.*), but as it stood in 1939 (PA 1937, No 155, as amended by PA 1939, No 244). Plaintiff

claims that defendant Eldridge agreed to pay him a contingent fee, amounting to whatever savings he could effect between the price at which he could obtain the property for and $1,000 per acre. However, if the price should be more than $1,000 an acre, then plaintiff claims that it was agreed that he should be paid for his time on a per diem basis, according to the schedule promulgated by the Detroit Bar Association.

The 38.3 acres were a part of a resubdivision of J. Calvert Sons' Van Dyke subdivision, city of Detroit, Wayne county, Michigan. The title had stood in the name of Calvert Fuel & Supply Company, the last owners before it was acquired by the State at tax sale. Under the scavenger act, *supra,* the last owner still had the right to bid and meet the bid at the scavenger sale.

Just what transpired at the first meeting between Storm and Eldridge is in dispute. Plaintiff did meet Mr. Curtis, an attorney in Eldridge's office and employ. Curtis testified that at that time he told plaintiff the condition of the title, including the tax situation, and that the title subject to the State's superior rights was then held by the trustee in bankruptcy of the Calvert Fuel & Supply Company, which, as last owner, still had certain preferential rights at the scavenger sale; that he explained the provisions of the then new scavenger sale act, *supra,* to the plaintiff. The Calvert Fuel & Supply Company was bankrupt and its affairs were being administered by the United States district court, eastern district of Michigan. Notwithstanding Curtis' testimony, plaintiff claims that he had to go to the office of the United States district court to ascertain that a Mr. Starr was the trustee in bankruptcy and that this is one of the many services rendered by him as an attorney. He sets forth with a great deal of particularity the various items that constituted his serv-

ices as an attorney and while they would not be at all impressive to an attorney of experience, it undoubtedly made an impression on the jury. Plaintiff had to obtain from the records the amount of past due taxes on approximately 248 lots in the 38.3 acres and the assessed valuation of each lot for the years 1938 and 1939 so as to determine what the minimum bid, 25% of the last assessed valuation, would amount to when it came to the sale under the scavenger act, *supra*. Plaintiff further claims that he was asked for legal advice of various kinds although defendant was an attorney and his employee, Mr. Curtis, was also an attorney. Since plaintiff claims remuneration for legal services and not as a real estate broker, and the jury held with the plaintiff, we need not discuss the claimed conflict in the decisions of this Court as to whether the statute of frauds applies to real estate brokers employed to purchase but not to sell real estate. See *Smith* v. *Starke,* 196 Mich 311; *Stephenson* v. *Golden,* 279 Mich 710, 753.

When the purchase of the property was first discussed by plaintiff and defendant, the former was handed a rough drawing of the 38.3 acres which he was to try and acquire. He contends that when he returned to his office he wrote on the bottom of this drawing "fee to be the difference between what property is acquired for and $1,000 per acre  *  *  *  if over $1,000 per acre on a minimum per hour per diem basis." Plaintiff interviewed the trustee in bankruptcy and his attorney a number of times. The latter insisted that they wanted to get at least $15,-000 net from their property over and above what had to be paid for it at the approaching sale under the scavenger act, *supra*. Defendant was not told at the time that plaintiff learned from the trustee that the bankrupt also had an interest as the last owner before tax sale of 127 lots immediately oppo-

site and to the east of the 38.3 acres. A more detailed
description is not necessary. These 127 lots were
still compact and constituted several blocks with
the exception of a very few that had been sold. The
lots aggregated 14.5 acres. The trustee refused to
sell his rights in the 38.3 acres for the price plaintiff
offered, unless he could also sell the 14.5 acres at a
proportionate price per acre. Agreements were
drafted by the plaintiff and William G. Starr, trustee
for Calvert Fuel & Supply Company, bankrupt,
dated January 30, 1940. They provided for a price
contingent on the amount bid at the scavenger sale.
The contract for the 38.3 acres provided for a grad-
uated scale with an outside total figure of $53,655.
It provided that plaintiff should pay the amount of
the bid plus 40% of the difference between such
amount and $51,655, and if the property were bid in
for a maximum amount of $51,655, then defendant
would pay an additional $2,000. If the property were
bid in for more than $51,655, the contract would be
terminated and each party released therefrom. It
further provided for a payment of 10% of $51,655
as a deposit to be made within 9 days after the date
of the contract, and if such deposit were not made
within such time, the contract became void. A con-
tract along similar lines was made the same day for
the 14.5 acres, providing for a sliding scale and a
deposit of $2,517.75, this being 10% of the maximum
bid at the scavenger sale, this amount also to be paid
within 9 days from the date of the contract and re-
turned if the bid price exceeded $25,177.50.

Although plaintiff claims that he spent 6 weeks in
negotiating with the trustee in bankruptcy for the
tentative purchase of the property and agreement
herein referred to, dated January 30, 1940, plaintiff
evidently was mistaken as Starr was not appointed
trustee until January 4, 1940. He filed his bond the
following day. The contract with plaintiff is dated

January 30, 1940. He also places undue importance on other acts. He could have obtained the information as to who was trustee of the bankrupt's estate, possibly by telephone, or at most in a few moments from the clerk's office in the United States district court. His statement of the "work done" undoubtedly impressed the jury. Plaintiff claims that the verbal contract with defendant provided also for a per diem remuneration in the event that the net price exceeded $1,000 per acre. Nevertheless, it is quite significant that plaintiff kept no track of the time necessary to secure the required information and the entering into the contract with the trustee in bankruptcy. Defendant left for Florida on or about the 20th day of January, 1940. The contracts with the trustee in bankruptcy were entered into on January 30, 1940, and plaintiff immediately sent a letter and a copy of the contract for the 38.3 acres to defendant. He also sent a draft of an agreement dated January 30, 1940, between himself and a blank space for insertion of the name of defendant or his nominee, by which the latter was to become the assignee of plaintiff's contract with the trustee in bankruptcy for the purchase of that property. The tendered draft of agreement provided for payment of $6,000 within 7 days and stated that if the agreement to pay such amount for the assignment were not in plaintiff's hands within such time then "first party shall not be bound by this agreement and shall be at liberty to make such other disposition of his interest in the property as he may deem fit." On the following day he wrote again that since his previous letter he had additional information which might be of interest to defendant; that he had secured a contract for the 14.5 acres almost adjacent to the 38.3 acres; that if defendant was interested in purchasing the 14.5 acres satisfactory arrangements could be made. In part, the letter reads:

"Should you come to a conclusion that you are not interested in the 38 acres or the adjoining 128 lots, I would appreciate your wiring me, at my expense, immediately as I have an opportunity to dispose of my contracts at a much more favorable basis to me than that upon which I have offered it to you, to a local building firm who proposes to use the land for the erection of the so-called low-priced housing projects."

Plaintiff admits that under his alleged verbal contract with defendant he was entitled, at the most, to only $4,639.54 for the services in connection with the 38.3 acres. As an attorney for defendant, as plaintiff claims he was engaged, he was in a position of trust and was attempting to collect or extort a sum in excess of the maximum to which he was entitled by taking advantage of his fiduciary relationship as an alleged attorney for defendant. The $6,000 demanded was only for services in regard to the 38.3 acres. He stated in his second letter that terms could be also arrived at in regard to the 14.5 acres, notwithstanding the fact that it was as an attorney acting for defendant that he learned of the additional acreage, almost contiguous to the 38.3 acres, and which the trustee would only sell in connection with the sale of the 38.3 acres. Defendant did not accept plaintiff's unusual offer, nor did he put up the deposit that plaintiff was required to make under his contract with the trustee in bankruptcy. Plaintiff never made any deposit for either the purchase of the 38.3 or the 14.5 acres. Defendant did, however, tell plaintiff to secure renewals of the contracts from time to time and plaintiff did secure such renewals. In July, however, plaintiff found out that defendant had hired another attorney who succeeded in obtaining an agreement with the trustee to purchase the right of the bankrupt to bid at the scavenger sale or to match any other bid, for a sum less than the

amounts provided for in the previous contracts, which plaintiff made with the trustee, and which never became effective because plaintiff did not make the deposits required thereunder. The trustee, or his assignee, would have been obliged to return these deposits if either was not the successful bidder at the scavenger sale. The case was tried before a jury and the trial judge directed a verdict for codefendants. The jury rendered a verdict for $6,000 against defendant, who appeals.

Plaintiff cross-appeals, claiming that the case against the 2 codefendants should not have been dismissed and, also, that the court erred on the question of interest. The case was properly dismissed as to the 2 codefendants as there was insufficient testimony to show any liability on their part. Inasmuch as plaintiff, as cross-appellant, does not raise the question in his brief, we need not further discuss it. In view of our decision, we need not discuss his claim of error in the court's disallowance of interest.

We have hereinbefore disposed of defendant's claim that plaintiff acted not as an attorney but as a real estate broker and, therefore, cannot recover on a verbal contract.

Defendant claims immunity from personal liability because he was acting in the capacity of an agent. He made no such claim during the trial and raises it for the first time on motion for a new trial. The question was thus not submitted to the jury. However, there is sufficient testimony to show that not only was he personally interested in the purchase of the property but that he was further personally liable as an agent for only partially disclosed principals. The question is fully discussed in *Dodge* v. *Blood,* 299 Mich 364 (138 ALR 322), in which the comment from 2 Restatement, Agency, § 321, is quoted. Inasmuch as defendant was acting in a manner so that the codefendants could not be bound,

he was personally liable. See *Newberry* v. *Slafter,* 98 Mich 468.

The records show that plaintiff had no contract with defendant at any time for the purchase of the 14.5 acres. If he acted as attorney for defendant, as he claimed, it was his duty to immediately disclose the opportunity or necessity to purchase the 14.5 acres in connection with the 38.3 acres. As an attorney under a contract in which a possible per diem compensation might have become due, it was his duty to disclose all facts to his client and not take advantage of the fiduciary relationship that arose in connection with the 38.3 acres. As an attorney he was in a position of trust. The opportunity to purchase the 14.5 acres arose solely through the negotiations on behalf of defendant. The 14.5 acres could not be bought except in connection with the purchase of the 38.3 acres. In the last analysis, defendant never bound himself to purchase the 14.5 acres. He never consummated such purchase. Plaintiff claims that he was stopped because defendant ordered him to desist and threatened him with disbarment proceedings. Under no sound theory can there be any recovery for any services in connection with the 14.5 acres.

Plaintiff unquestionably acted fraudulently in demanding $6,000 for services solely in connection with the 38.3 acres when, according to his own admission, only $4,639.54 would be due him. Although plaintiff demanded the $6,000 as his fee and made no counteroffer, the judge in his charge to the jury stated that plaintiff's position was that the demand for $6,000 was simply a "counteroffer." There is no basis for this statement in the testimony. It constitutes error and in itself is sufficient to necessitate a new trial. Plaintiff further claims, however, that after he made the demand for $6,000 plus such other sums as might be agreed upon for services in regard to

the 14.5 acres defendant did not discharge him but told him to keep on negotiating and securing renewals of his agreement with the trustee and that he further gave legal advice in regard to restrictions on the property and the vacating of the plat, although in subsequent testimony he stated that the plat for the subdivision, so far as the 38.3 acres were concerned, had already been vacated when he examined the tract index to ascertain the owner of the property. When plaintiff learned that another attorney, acting for defendant, had succeeded in obtaining an agreement from the trustee to sell at a much lower price, he asked defendant for payment of fees and defendant referred him to his brother, who offered to pay a 5% real estate brokerage fee and offered as much as $800, but plaintiff refused to accept such amount. Plaintiff performed some services after defendant learned of his conduct and demands. Defendant did not deny any part of plaintiff's testimony except to state that he never hired him as an attorney but on the other hand he had acted as plaintiff's attorney when he was in a real estate company which bore his name; further, that Mr. Curtis looked after his legal work if he needed any assistance. If this were an equity suit, heard *de novo,* we would have no difficulty in coming to conclusions but it is a law action in which plaintiff raises the question of waiver.

The judgment should be set aside and a new trial ordered solely on the question of whether defendant, after learning of plaintiff's conduct, waived the defense of fraud and duplicity by "instructing" plaintiff to continue his efforts and telling him he would be paid for his services, as claimed by plaintiff, and if not waived, whether plaintiff is entitled to recover the reasonable value of his services for what he did at defendant's request after the latter learned of plaintiff's improper conduct. In no event can plain-

tiff recover more than $4,639.54, the amount claimed for his services in connection with the 38.3 acres. Defendant will recover costs in both courts.

DETHMERS, C. J., and ADAMS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.