STATE BAR GRIEVANCE ADMINISTRATOR v ESTES

OPINION OF THE COURT

1. ATTORNEY AND CLIENT—APPEAL AND ERROR—CERTIORARI—DE
   NOVO REVIEW.

   Traditionally, review of final orders of discipline of attorneys has
   been in the nature of certiorari rather than *de novo* review.

2. ATTORNEY AND CLIENT—DISCIPLINARY PROCEDURES—SUPREME
   COURT—ADMINISTRATIVE LAW.

   The new disciplinary procedures against attorneys, effective
   March 1, 1970, are, prior to final review by the Michigan
   Supreme Court, administrative and quasi-judicial in nature,
   rather than primarily judicial.

3. ATTORNEY AND CLIENT—CERTIORARI—CONSTITUTIONAL LAW—DE
   NOVO REVIEW—APPEAL AND ERROR.

   Review in the nature of certiorari meets the constitutional re-
   quirement that review of decisions of administrative agencies
   "shall include, as a minimum, the determination whether such
   final decisions, findings, rulings and orders are authorized by
   law; and, in cases in which a hearing is required, whether the
   same are supported by competent, material and substantial
   evidence on the whole record" and it also serves to give real
   meaning to the powers and duties given the State Bar Griev-
   ance Board and hearing panels under a State Bar rule; thus,
   the Michigan Supreme Court retains the standard for review
   established by case law prior to adoption of new disciplinary
   rules, effective March 1, 1970, and it will not proceed to

REFERENCES FOR POINTS IN HEADNOTES

[1, 10, 12, 16] 7 Am Jur 2d, Attorneys at Law § 53.

[2] 7 Am Jur 2d, Attorneys at Law §§ 66, 67.

[3, 4] 4 Am Jur 2d, Appeal and Error § 171.

[5, 7–9, 11, 17] 7 Am Jur 2d, Attorneys at Law §§ 171, 178, 186.

[5–7, 11, 17] Attorney's liability for negligence in preparing or con-
ducting litigation, 45 ALR2d 5.

[6, 7] 7 Am Jur 2d, Attorneys at Law § 178.

Authority of attorney to compromise action, 30 ALR2d 944.

[13–15] 7 Am Jur 2d, Attorneys at Law § 12 *et seq.*

adjudicate a disciplinary proceeding case *de novo,* but instead it will determine whether the State Bar Grievance Board's findings have proper evidentiary support on the whole record (Const 1963, art 6, § 28; State Bar Rule 16).

4. ATTORNEY AND CLIENT—APPEAL AND ERROR—SUPREME COURT—
   STATE BAR HEARING PANEL—STATE BAR GRIEVANCE BOARD—
   WITNESSES—CREDIBILITY—ATTORNEY'S AUTHORITY—COMPROMISE
   AND SETTLEMENT.

   Michigan Supreme Court will not substitute its judgment for that of a State Bar hearing panel which had an opportunity and a mandate not only to garner evidence of misconduct of an attorney but to observe and assess the demeanor and credibility of the witnesses where there was sufficient testimony and factual support on the record to enable a State Bar hearing panel and the State Bar Grievance Board to conclude, so they did, that an attorney lacked authority to settle his client's case.

5. ATTORNEY AND CLIENT—STATE BAR HEARING PANEL—STATE BAR
   GRIEVANCE BOARD—EVIDENCE—FINDINGS.

   There was sufficient evidence to support the findings made by a State Bar hearing panel which were affirmed by the State Bar Grievance Board that an attorney failed to inform and communicate with his client in a cause pending against the client where the attorney admitted that he did not communicate with his client for over two years, the client's correct address was known to the attorney and remained unchanged during that period.

6. ATTORNEY AND CLIENT—NEGLIGENCE—INATTENTION—INCOMPE-
   TENCE.

   An attorney's negligence, inattention, or professional incompetence in handling clients' affairs can constitute an ethical violation of standards imposed upon the Bar and it is breach of an attorney's ethical obligation to the Bar and to his or her client to settle a case without specific authority.

7. ATTORNEY AND CLIENT—UNAUTHORIZED SETTLEMENT OF CLIENT'S
   CAUSE—DISCIPLINARY GROUNDS.

   Unauthorized settlement of a client's cause, barring subsequent ratification, is, and has traditionally been, the sort of breach of an attorney's ethical duty intended to be included within the disciplinary grounds outlined in a State Bar rule providing for grounds for discipline in general (State Bar Rule 15, § 2).

8. ATTORNEY AND CLIENT—DISCLOSURE.

   Failure to disclose all relevant facts and information known by

an attorney to his or her client has traditionally been regarded as breach of an attorney's ethical obligation.

9. ATTORNEY AND CLIENT—DISCIPLINARY ACTION—JUDGMENTS.

Conduct of an attorney warrants appropriate disciplinary action where the attorney not only failed to advise his client of the course and content of settlement negotiations, but even failed to advise him of the approaching trial date and the subsequent consent judgments.

10. APPEAL AND ERROR—SUPREME COURT—ATTORNEY AND CLIENT—SUSPENSION.

Michigan Supreme Court has been given the power under a State Bar rule to make such order on appeal as it may deem appropriate and in view of that power and upon lengthy consideration of the facts on record and the equities in a particular case, it affirms the State Bar Grievance Board order of suspension of an attorney, but reduces the period of suspension from 1 year to 60 days (State Bar Rule 16.23[h]).

### CONCURRING OPINION

T. E. BRENNAN, T. G. KAVANAGH, and LEVIN, JJ.

11. ATTORNEY AND CLIENT—STATE BAR HEARING PANEL—FINDINGS—EVIDENCE—JUDGMENTS—COMPROMISE AND SETTLEMENT—SUSPENSION.

*State Bar hearing panel's findings, that an attorney failed to inform and communicate with his client in a cause pending against the client, that he not only failed to advise his client of the course and content of settlement negotiations but even failed to advise him of the approaching trial date and the subsequent consent judgments, and that he lacked authority to settle his client's case, are adequately supported by the evidence where the attorney admitted that he did not communicate with his client for over 2 years, the client's correct address was known to the attorney and remained unchanged during that period; the suspension of the attorney should be reduced from 1 year to 60 days.*

12. CERTIORARI—ATTORNEY AND CLIENT—MISCONDUCT OF ATTORNEY—GRIEVANCE PROCEDURES—SUPREME COURT—FACTUAL DETERMINATIONS—STATE BAR GRIEVANCE BOARD.

*Certiorari scans the record for errors of law, which by definition includes the absence of evidence to support a finding of fact; since the new grievance procedures were adopted, the Michigan Supreme Court has regularly reviewed records to determine*

whether the State Bar Grievance Administrator's charge of professional misconduct against an attorney has been adequately proven; a truncated review by certiorari would insulate from appellate scrutiny close questions of fact determination by the State Bar Grievance Board and that Court owes it to the profession and the public not to reduce its reviewing responsibility.

13. ATTORNEY AND CLIENT—STATE BAR GRIEVANCE BOARD—SUPREME COURT—CONSTITUTIONAL LAW—DISCIPLINE OF ATTORNEYS—STATE BAR RULES—SUPERINTENDING CONTROL.

The State Bar Grievance Board was created by the Michigan Supreme Court within the State Bar of Michigan as "the arm of the Supreme Court for the discharge of its exclusive constitutional responsibility to supervise and discipline the members of the State Bar of Michigan"; the Board is part of the administrative structure of that Court and the responsibility for the Court's creation is nondelegable (State Bar Rule 16).

14. ATTORNEY AND CLIENT—GRIEVANCE PROCESS—SUPREME COURT.

Now the Michigan Supreme Court is the only judicial participant in the State Bar grievance process.

15. ATTORNEY AND CLIENT—DISCIPLINARY MATTERS—STATUTES—REVISED JUDICATURE ACT—SUPREME COURT.

The Revised Judicature Act provides that the practice and procedure in State Bar disciplinary matters are to be prescribed by rules and regulations adopted by the Supreme Court (MCLA 600.904).

16. ATTORNEY AND CLIENT—STATE BAR GRIEVANCE BOARD—REVIEW—FINDINGS.

Both the language of the rules and regulations adopted by the Michigan Supreme Court and the Court's actual practice confirms that the Court's review of State Bar Grievance Board fact finding is more comprehensive than a limited search for some evidence tending to support the Grievance Board's findings of fact; the Court has and ought to continue to closely scrutinize these records to determine whether the record support is convincing and persuasive.

17. ATTORNEY AND CLIENT—COMPROMISE AND SETTLEMENT—AUTHORITY.

The kind of general settlement authority an attorney claimed, "as good a settlement as I could on damages," would not permit a lawyer finally to agree to terms of settlement without further consultation with and final approval of his client.

Appeal from State Bar Grievance Board. Submitted September 6, 1973. (No. 7 September Term 1973, Docket No. 54,463.) Decided December 18, 1973.

Disciplinary proceedings against Walter O. Estes. Order entered suspending respondent from practicing law for one year. Respondent appeals. Affirmed with suspension reduced to 60 days.

*Eugene N. LaBelle,* for State Bar Grievance Administrator.

*Walter O. Estes, in propria persona.*

WILLIAMS, J. This case comes to us on appeal from the State Bar Grievance Board (hereafter "Board"). Appellant attorney, Walter O. Estes, contends both that the facts elicited in hearing panel testimony are insufficient to support a finding · of unprofessional conduct, and that, in any case, such conduct as the Board found appellant engaged in does not present grounds warranting disciplinary suspension from the practice of law. Thus the facts in this case are of essential importance.

## I—FACTS

Appellant represented a client, Earl Harmon, who was involved in a rear-end accident in East Lansing on September 7, 1965. Previously, without counsel, Harmon had consented to a judgment against him of $855.25 in favor of the City of East Lansing, owner of the truck that Harmon rear-ended. Appellant represented Harmon in a second suit, a personal injury action brought by a passen-

ger in the truck, Charles L. Malcomb, on June 26, 1967.

Appellant prepared an answer to the suit which he filed and mailed to Harmon; he took Harmon's deposition on January 5, 1968. Appellant stated that he gave Harmon notice of deposition by letter after he was unable to reach Harmon by using the telephone number Harmon gave him. Just after the deposition was taken, appellant testified that he had a conversation with his client wherein Harmon agreed with appellant's advice that liability had been "virtually admitted" and that the only issue remaining was damages. Appellant claims that this conversation constituted authorization to make "as good a settlement as he could on the damages". It is a controverted question whether or not Harmon himself admitted or denied in his hearing-panel testimony that he was told by appellant that the damages were the only remaining issue, or whether he admitted or denied authorizing settlement.

A trial date was set in this action for February 16, 1971. On January 9, 1970, appellant consented to the entry of a summary judgment in favor of plaintiff as to liability. On February 19, 1971, appellant consented to the entry of a consent judgment for damages in the sum of $30,654.35. No correspondence or conversations at all were had before entry of these judgments by appellant with Harmon after the January 5, 1968, conversation at Harmon's deposition. Appellant stated that he attempted to phone his client before both the summary and consent judgments, but was unable to reach him; no written communications were attempted. Harmon testified that the first notification he had of these judgments was by the Secre-

tary of State when his operator's license was re-
voked for failure to satisfy the consent judgment.
During all this period, Harmon resided at the
same address appellant wrote to in 1967. Appel-
lant testified that Harmon's home was about five
miles from his office.

Appellant justifies his lack of contact with Har-
mon on the grounds that he was expressly autho-
rized to make as good a settlement as possible and
that the amount he consented to was $19,000 less
than plaintiff's "confirmed damages". Before the
hearing panel, appellant admitted that he was
aware that there was considerable doubt whether
Harmon, a farm laborer, could pay a judgment of
this magnitude.

A Board hearing panel found that appellant had
violated Rule 14 (now Rule 15), §§ (1), (2), and (3)
and an order was filed July 17, 1972, suspending
appellant from the practice of law for one year.
The Board affirmed the panel on October 18, 1972.

## II—STANDARD FOR REVIEW

Appellant appealed to this Court under Rule
16.23 of the Michigan Supreme Court Rules for
the State Bar Grievance Board from a final order
of discipline. The initial issue to be resolved is the
nature of our review on appeal of Board final
orders. Traditionally, review of such orders has
been in the nature of certiorari rather than *de
novo* review. *Attorney General v Lane,* 259 Mich
283, 285–287; 243 NW 6 (1932); *cert den* 287 US
654; 77 L Ed 565; 53 S Ct 115 (1932); *Attorney
General v Nelson,* 263 Mich 686, 700–701; 249 NW
439 (1933); *Attorney General v Shaw,* 289 Mich
468, 469; 286 NW 793 (1939); *In re Estes,* 355 Mich

411, 424; 94 NW2d 916 (1959); *cert den* 361 US
829; 4 L Ed 2d 71; 80 S Ct 77 (1959).[1]

We have not had cause though to discuss the
question of standard of review since the advent of
new disciplinary rules and procedures effective
March 1, 1970. It is significant that the new disci-
plinary procedures are, prior to final review by
this Court, administrative and quasi-judicial in
nature, rather than primarily judicial. Const 1963,
art 6, § 28, provides in relevant part:

"Sec. 28. All final decisions, findings, rulings and
orders of any administrative officer or agency existing
under the constitution or by law, which are judicial or
quasi-judicial and affect private rights or licenses, shall
be subject to direct review by the courts as provided by
law. This review shall include, as a minimum, the
determination whether such final decisions, findings,
rulings and orders are authorized by law; and, in cases
in which a hearing is required, whether the same are
supported by competent, material and substantial evi-
dence on the whole record."

Review in the nature of certiorari meets this
constitutional requirement. It also serves to give
real meaning to the powers and duties given the
Board and hearing panels under Rule 16. We thus
retain the standard for review established by case

---

[1] A more recent case, *State Bar of Michigan v Lavan,* 384 Mich 624;
186 NW2d 331 (1971), does contain somewhat conflicting and confus-
ing language on this point, noting in one instance that:

"It is scrupulous concern for fairness to an accused brother at the
Bar which has lead this Court to embark upon a second *de novo*
review of the evidentiary record in these proceedings." 384 Mich 624,
631.

Yet, only two sentences further in the opinion, the lower court
judgment was affirmed noting:

"The misconduct found by the circuit court panel sitting *en banc*
was fully substantiated by the record." 384 Mich 624, 631.

It appears that the use of the phrase *de novo* in the first instance
was poor phrasing of the Court's intent to fully scrutinize the facts on
the record. In any case, the instant opinion clarifies this ambiguity.

law prior to adoption of these new disciplinary rules. Thus we will not proceed to adjudicate this case *de novo,* but instead we will determine whether the Board's findings have proper evidentiary support on the whole record.

## III—EVIDENTIARY SUPPORT FOR FINDINGS

The hearing panel in this action made the following findings which were affirmed by the Board:

"CONCLUSIONS

"Upon careful consideration of the facts, the panel concludes as follows:

"1) That Respondent failed to fully and properly keep his client advised and informed of the proceedings in the cause pending against the Complainant and in which Respondent had undertaken to defend him.

"2) That Respondent failed to communicate with the Complainant Harmon, his client, and to obtain his consent to the entry of the Consent Judgment and for that matter consent to the entry of the partial summary judgment regarding liability.

"3) That he did not have authority either express or implied to consent to the entry of judgment for $30,654.35; that the decision as to whether a consent judgment ought to be agreed to is a decision which only a client can make after discussion with and advice by the attorney.

"4) That Respondent did in the premises violate Rule 14 [now Rule 15] (1) (2) (3).

"5) That the panel has considered carefully Respondent's claim that he was left with the impression after the January 5, 1968, depositions, that he had authority to settle, but it is not convinced from the proofs presented that such authority was in fact given or that Respondent who had practiced law for many, many years could have been given that impression from the conversation which is alleged to have taken place at that time; that the panel has also carefully considered the lack of education, training, and experience of the

Complainant having entered the 10th grade but not having completed same, and being a common laborer presently employed as a farm laborer which factor should have at the very least caused Respondent to exercise the utmost care in handling the affairs of the Complainant. The panel has also considered carefully the failure of the Respondent to communicate with the Complainant Harmon except on the two occasions hereinabove referred to, his failure to give notice of trial, and of the entry of the judgment to the Respondent."

This Court must now determine whether the whole record supports such findings. We conclude that it does.

Whether or not appellant was authorized to settle his client's case is an issue which was a focal point of argument by both parties in their briefs to this Court and upon oral argument. (Conclusions 2, 3, 5.) It is quite clear that appellant stated in testimony before the hearing panel that he believed he had authority to settle, *e.g.:*

"At the time of the Deposition it was apparent that the liability was admitted. It was a question of damage and at that time, Mr. Harmon and I talked and I told him that it was a question of—now, it was simply a question of damages and he told me to hold the damage down because he didn't think the man was hurt as bad as he claimed, but he authorized me to do the best I could in holding those damages down.

\* \* \*

"I think I was authorized by Mr. Harmon to make as good a settlement as I could on the damages.

\* \* \*

"I advised Mr. Harmon at the time of the pretrial conference that the summary judgment probably would enter. Now, he didn't dispute their right to a summary judgment as far as liability. His question was on damages.

\* \* \*

"No, I wouldn't say let it go at that. I felt sincerely, I felt that after our conversation that he knew that there would be a judgment against him, and that he wanted me to make as good a settlement on the amount of that judgment as possible, and it was left that way."

What is controverted is the simple question whether Harmon, on the record, admitted or denied authorization. Appellant relies primarily on the following colloquy before the hearing panel as supportive of his contention that Harmon admitted authorizing appellant to settle his case:

*"Q. (Mr. Estes):* Now, let's bet *[sic]* back now to the conversation in the hallway. The suit by Mr. Malcomb was not for property damage, was it, Mr. Harmon?

*"A.* No, it was not.

*"Q.* And in our conversation down the hall, didn't you authorize me to settle this suit with Mr. Harmon at as low a figure as I could?

*"Chairman Piggott:* With Mr. Malcomb?

*"Q. (Mr. Estes):* With Mr. Malcomb.

*"A.* I don't know how you had that phrased there.

*"Chairman Piggott:* Would the reporter read the question back?

"(Thereupon, the question was read back by the reporter.)

*"The Witness:* I don't recall saying that. No, I don't.

*"Q. (Mr. Estes):* Well, do you recall telling me to settle the damage suit without going into court, did you not?

*"A.* No, I don't recall that either.

*"Q.* You said you recalled authorizing me to settle the property damage suit and the property damage suit wasn't involved in this Malcomb, was it?

*"A.* No.

*"Q.* Then if you authorized me to settle any damages that would be the damages in the Malcomb case, isn't that right?

*"A.* Yes."

Appellant incorrectly construes the import of this language. The only "admission" that Harmon made in the preceding testimony was the "admission" that *if* there were any authority given to settle, it was authority with respect to the Malcomb case. That is. far different from admitting that such authorization was *actually* given. In fact, Harmon *specifically* denied giving any authorization in previous, and upon further, questioning by appellant, *e.g.*:

"*Q. [Estes]:* Now, as we went down the hall, didn't you tell me that you thought Mr. Malcomb's claim of damage was too much and that you wanted me to work out a settlement for as low a figure as possible?

"*A. [Harmon]:* No, I don't remember talking like that.

\* \* \*

"*The Witness [Harmon]:* All we talked about as we went down the hall is the guy passing away and about the City. That is all I recollect because we wasn't in the hall that long to do all that talking. You didn't ask me to come down to the office and talk. We was going down the hall and you mentioned that much, well, I think we might have this case won because the guy has passed away. Now, that is what you told me.

"*Q. (Mr. Estes):* All right. But didn't in the course of the conversation, wasn't it brought out that there was only the question of damages left?

"*A.* Yes. This is when you said we thought we had it won when he passed away.

"*Q.* But along with that, isn't that the only question left that we had to dispose of, the question of damages?

"*A.* Not that—not of my knowledge."

\* \* \*

"*Q. [Estes]:* Do you recollect that you told me that you wanted me to settle that loss of wages item?

"*A. [Harmon]:* No, I don't recollect that, no, saying that.

\* \* \*

"*Q.* Did you—do you recall telling me that you

wanted me to check into it and settle it as well as I could?

"*A.* I think I asked, asked you to check into the wages.

"*Q.* Now, in talking about the wages, we were talking about the claim of damage in the Malcomb suit against you, weren't we?

"*A.* This is something I don't recollect. It was an awful short hall and you wasn't doing all that talking.

\* \* \*

"*Q. [Estes]* And didn't you tell me at that time that you would like the thing disposed of without a trial?

"*A. [Harmon]* Not of my recollection, no.

"*Q.* You don't recall telling me to settle it without a trial?

"*A.* No.

"*Q.* All you recall then apparently is that you wanted me to look into the question of loss of wages?

"*A.* Yes."

We conclude that there was sufficient testimony and factual support on the record to enable the hearing panel and the Board to conclude, as they did, that appellant lacked authority to settle Harmon's case. We will not substitute our judgment for that of the panel below which had an opportunity and a mandate not only to garner evidence of misconduct but to observe and assess the demeanor and credibility of the witnesses.

The second general finding of the hearing panel below, that appellant failed to inform Harmon of proceedings and judgments, (Conclusion 2) is less seriously controverted by appellant on the record. Appellant admitted at all stages of this proceeding that he did not communicate with his client from January 5, 1968, the date of the alleged "authorization to settle" until sometime subsequent to his consent to, and entry of, summary judgment as to liability on January 9, 1970, and consent judgment

as to damages on February 19, 1971. Appellant's only contention before the hearing panel was that he *attempted* to get in touch with Harmon by phone; but it is undisputed on that same record that appellant possessed Harmon's correct address at minimum from the summons, that Harmon's address remained unchanged during this period, that appellant had used that address in 1967 to mail to Harmon a copy of the answer to the complaint, and that Harmon's house was only "about five miles" from appellant's office. All of the preceding being a part of the record before the hearing panel and Board, we are compelled to conclude that there was sufficient evidence to support the findings made with respect to appellant's failure to inform and communicate with his client.

## IV—SUPPORT FOR DISCIPLINARY ACTION

Given the sufficiency of the evidence below to support the findings made, we are faced with the ultimate question whether such findings support disciplinary action.

The hearing panel based discipline on violation of Rule 15, § 2 (1), (2) and (3) which reads as follows:

"Section 2. GROUNDS FOR DISCIPLINE IN GENERAL.

"The following acts or omissions by a member of the bar of this State, individually or in concert with any other person or persons, shall constitute misconduct and shall be grounds for discipline whether or not the act or omission occurred in the course of an attorney-client relationship.

"(1) Conduct prejudicial to the proper administration of justice;

"(2) Conduct that exposes the legal profession or the courts to obloquy, contempt, censure or reproach;

"(3) Conduct that is contrary to justice, ethics, honesty or good morals."

It is quite clear that the behavior of appellant as reflected in the factual findings of the Board hearing panel, falls within the grounds for discipline enumerated above.

An attorney's negligence, inattention, or professional incompetence in handling clients' affairs can constitute an ethical violation of standards imposed upon the Bar.[2] Numerous Michigan cases stand for the proposition that it is breach of an attorney's ethical obligation to the Bar and to his or her client to settle a case without specific authority.[3] Most recently, we held in *Henderson v Great Atlantic & Pacific Tea Co,* 374 Mich 142; 132 NW2d 75 (1965) that:

" '[A]n attorney at law has no power, by virtue of his general retainer, to compromise his client's cause of action; but that precedent special authority or subsequent ratification is necessary to make such a compromise valid and binding on the client.' " 374 Mich 142, 147 (citing from 66 ALR 107).

Even more on point is the recent Court of Appeals decision in *Hartman v Frontier City, Inc,* 20 Mich App 274; 174 NW2d 48 (1969). The attorney in that case presumed authorization to settle from

---

[2] *See for example Attorney General v Lane, supra; State Bar of Michigan v Daggs,* 384 Mich 729; 187 NW2d 227 (1971). *See generally Annotation: ATTORNEY—NEGLIGENCE—DISCIPLINE,* 96 ALR2d 823.

[3] In addition to the two cases specifically cited for this proposition *infra,* see also *Wells v United Savings Bank of Tecumseh,* 286 Mich 619, 622; 282 NW 844 (1938); *Peoples State Bank for Savings v Bloch,* 249 Mich 99, 104–106; 227 NW 778 (1929); *Fetz v Leyendecker,* 157 Mich 355, 356; 122 NW 100 (1909); and *Eaton v Knowles,* 61 Mich 625, 632; 28 NW 740 (1886).

*See generally Annotation: COMPROMISE—ATTORNEY'S AUTHORITY,* 30 ALR2d 944.

his client's alleged permission "to do what you think is best." Unanimously, the Court of Appeals noted:

"Certainly the granting of such a special authority requires more than the general statement that we are presented with here. Our review of the record convinces us that at least plaintiff did not have a 'full understanding of the provisions in the [proposed] settlement.' " 20 Mich App 274, 277.

It is clear from these cases that unauthorized settlement of a client's cause (barring subsequent ratification) is, and has traditionally been, the sort of breach of an attorney's ethical duty intended to be included within the disciplinary grounds outlined in Rule 15, § 2.

Similarly, the failure to disclose all relevant facts and information known by an attorney to his or her client has traditionally been regarded as breach of an attorney's ethical obligation. *Kukla v Perry,* 361 Mich 311, 317; 105 NW2d 176 (1960); *Storm v Eldridge,* 336 Mich 424, 435; 58 NW2d 129 (1953).[4] It is clear from this record that appellant not only failed to advise Harmon of the course and content of settlement negotiations, but even failed to advise him of the approaching trial date and the subsequent consent judgments. Certainly on these facts, it is quite clear that such conduct warrants appropriate disciplinary action.

## V—CONCLUSION

We conclude that the hearing panel's findings in

---

[4] Additionally, as the Court noted in *Kukla,* not only is there an attorney's obligation to impart full information to his or her client, the burden of proof is on the attorney to prove beyond "reasonable question" that such information was given. 361 Mich 311, 317. *See also McIntosh v Fixel,* 297 Mich 331, 347; 297 NW 512 (1941).

this case are supported by competent evidence on the whole record. We further conclude that these findings fully support and warrant disciplinary action. However, this Court has been given the power under Rule 16.23(h) to make such order on appeal as we may deem appropriate. In view of that power and upon lengthy consideration of the facts on record and the equities in this particular case, we affirm the Board order of suspension, but reduce the period of suspension from 1 year to 60 days.

Order affirmed with the period of suspension reduced from 1 year to 60 days.

T. M. KAVANAGH, C. J., and SWAINSON and M. S. COLEMAN, JJ., concurred with WILLIAMS, J.

LEVIN, J. *(concurring)*. We agree that the hearing panel's findings are adequately supported by evidence and that the suspension should be reduced from 1 year to 60 days.

We see no need to consider the standard of review. Whatever the standard, the answer is the same; the charges of professional misconduct were proven, the findings of the Grievance Board are affirmed and the period of suspension is reduced.

Since the standard of review has been discussed, we are obliged to express our disagreement with the statement that this Court's review of grievance proceedings is in the nature of certiorari. While certiorari was the standard when disciplinary orders were issued by panels of three circuit judges subject to only discretionary review by this Court, this limited review would be inconsistent with both the concept and practice of the present grievance procedure.

Certiorari scans the record for errors of law, which by definition includes the absence of evi-

dence to support a finding of fact.[1] Since the new grievance procedures were adopted, this Court has regularly reviewed records to determine whether the administrator's charge of professional misconduct has been adequately proven.[2] This Court has, thus, shown its concern for the adequacy of the record and for meaningful review in grievance proceedings of the crucial fact-finding process. A truncated review by certiorari would insulate from appellate scrutiny close questions of fact determination by the Grievance Board. We owe it to the profession and the public not to reduce our reviewing responsibility.

The State Bar Grievance Board was created by this Court within the State Bar of Michigan as "the *arm of the Supreme Court* for the discharge of its exclusive constitutional responsibility to supervise and discipline the members of the State Bar of Michigan." Preamble to Rule 16, Rules Concerning the State Bar of Michigan.[3] (Emphasis supplied.)

In contrast with an independent administrative agency created by the Legislature, a jury composed of persons drawn from the community, a court with established traditions, the Grievance Board is part of the administrative structure of this Court; our responsibility for our creation is nondelegable.

"All proceedings hereunder," say the State Bar

---

[1] *Ronna Hope Serlin, Inc v Liquor Control Commission,* 347 Mich 268, 270–271; 79 NW2d 489 (1956); *Erlandson v Genesee County Employees' Retirement Commission,* 337 Mich 195, 201–202; 59 NW2d 389 (1953).

[2] *See State Bar of Michigan v Lavan,* 384 Mich 624; 186 NW2d 331 (1971); *Holt v State Bar Grievance Board,* 388 Mich 50; 199 NW2d 195 (1972).

[3] If, as Rule 16 states, the "exclusive constitutional responsibility to supervise and discipline the members of the State Bar of Michigan" is vested in this Court, then there is no need to consider the "minimum standard of review" spelled out in Const 1963, art 6, § 28.

Grievance Board Procedural and Administrative Rules promulgated by this Court, "are subject to the superintending control of the Supreme Court." Rule 16.33(a). "These rules and Rule 15 shall be liberally construed for the protection of the public, the courts and the legal profession". Rule 16.33(d). "The Supreme Court may make *such order as may be deemed appropriate,* including dismissal of the appeal or affirmance of the order appealed from." Rule 16.23(h) (Emphasis supplied.)

When *Attorney General v Lane,* 259 Mich 283, 286; 243 NW 6 (1932), was decided, review by this Court was on "motion of appeal", construed in *Lane* to mean "application for, and allowance of, an appeal." Such an application sought review of a decision by a panel of three circuit judges; now this Court is the only judicial participant in the grievance process.

The grievance procedure was then statutorily prescribed.[4] The statute expressly provided for review by the Supreme Court on "application thereto for a writ of certiorari". 1929 CL 13585. *Lane* construed a 1931 amendment[5] of this statute as not changing the legislative intent to limit the review to certiorari.[6]

---

[4] Justice WILLIAMS' opinion states: "We thus retain the standard for review established by case law prior to adoption of these new disciplinary rules." The case law, *Lane,* was based on a statute since repealed. *Lane* implements a legislative choice and does not purport to state what the Court in the exercise of its own independent judgment thought to be a sound reviewing standard.

[5] 1931 PA 171.

[6] The Court viewed the substitution of the words "motion of appeal" for the words "application thereto for a writ of certiorari" as consonant with a change made by the Court Rules of 1931 which substituted a "notice of appeal" for other methods of invoking appellate intervention *(e.g.,* writ of error, appeal, certiorari, etc.). The 1931 court rule expressly provided that this change shall not be deemed to restrict or enlarge the "right of review". The *Lane* Court stated that the 1931 legislative enactment "evidently endeavored * * * to speak the language" of the 1931 court rule, and concluded: "Our omnibus

The present legislation (the Revised Judicature Act) provides that the practice and procedure in State Bar disciplinary matters are to be prescribed by rules and regulations adopted by the Supreme Court. MCLA 600.904; MSA 27A.904.

Both the language of the rules and regulations adopted by this Court and this Court's actual practice confirms that this Court's review of Grievance Board fact finding is more comprehensive than a limited search for some evidence tending to support the Grievance Board's findings of fact. We have and ought to continue to closely scrutinize these records to determine whether the record support is convincing and persuasive. While we have not heretofore articulated a standard indicating the parameters of our review, neither have we, before, suggested a narrow approach to our reviewing responsibility.

In this very case the review of the record was careful and comprehensive. Justice WILLIAMS' opinion thoughtfully reviews the evidence and demonstrates that in fact Harmon had not admitted at the grievance panel hearing that he authorized Estes to settle the damage claims against Harmon. And even if he had authorized Estes to settle, the kind of general settlement authority Estes claimed, "as good a settlement as I could on damages," would not permit a lawyer finally to agree to terms of settlement without further consultation with and final approval of his client.

We would have no difficulty with Justice WILLIAMS' opinion if it stated the standard as it is stated at the conclusion of Part II of the opinion, "we will determine whether the Board's findings

---

nomenclature of appeals leads us now to look through the verbiage of the statute and rule, and term the review an appeal in the nature of * * * certiorari." *Attorney General v Lane, supra,* pp 286–287.

have proper evidentiary support on the whole record."

T. E. BRENNAN and T. G. KAVANAGH, JJ., concurred with LEVIN, J.