STATE BAR GRIEVANCE ADMINISTRATOR v SILVERMAN

Docket No. 62082. Argued March 6, 1979 (Calendar No. 2).—Decided March 18, 1980.

Alan H. Silverman was suspended from the practice of law for 30 days by the State Bar Grievance Board. The finding of professional misconduct arose out of the purchase for himself, with a client's permission, of certain real property after the client had declined to purchase it. Silverman had obtained a judgment for the client against a debtor who had a vendee's interest in the property. The complaint alleged that Silverman had failed to disclose to the client that money in a trust account containing payments made on the property by contract sub-vendees of the land would be applied as payment on the judgment debtor's obligation to the vendor rather than on the judgment indebtedness to the client. The Grievance Board found that Silverman's explanation of the transaction had caused the client to misunderstand and hence disapprove of the use of the money in the trust account, and that the misunderstanding "exposed the legal profession to obloquy, contempt, censure and reproach" in violation of the State Bar Rule. Silverman appeals. In an opinion by Justice Ryan, joined by Chief Justice Coleman and Justices Williams and Moody, the Supreme Court held:

1. There is no question that the funds did not belong to the client and that the respondent's ultimate use of them was lawful. The point is that since the funds were generated only because of the respondent's representation of his client as his agent, it is understandable that the client might have some trouble reconciling the facts that the respondent obtained $1,591.21 for himself and that his client wound up receiving only $336.74 and a bill for attorney fees of $470. The explanation for that should have been given to the client to preclude his understandably concluding that his lawyer had served his

REFERENCES FOR POINTS IN HEADNOTES

[1] 4 Am Jur 2d, Appeal and Error § 171.

7 Am Jur 2d, Attorneys at Law §§ 15-18.

[2-4] 7 Am Jur 2d, Attorneys at Law §§ 25, 32, 35.

[4-6] 7 Am Jur 2d, Attorneys at Law § 64.

own purposes but not his client's, thereby bringing the entire legal profession into obloquy, contempt, censure and reproach.

2. The evidence was ample to justify the conclusion of the hearing panel members, who saw and heard the witnesses and examined the exhibits, that the client did not understand the combination of legal principles and facts which justified the respondent's use of the money for his own purposes and that the respondent did not take reasonable means to explain the legal legitimacy of his actions. The resolution by the hearing panel and State Bar Grievance Board members of the fact questions upon which this case turns, particularly with respect to the credibility of the witnesses, has proper evidentiary support in the record as has the conclusion that the respondent violated the State Bar Rule. The findings and conclusion of the State Bar Grievance Board are affirmed but the discipline is reduced to a reprimand and payment of costs as assessed.

Justice Levin, joined by Justices Kavanagh and Fitzgerald, dissented. He would hold that the finding of misconduct by the hearing panel and Grievance Board exceeded the scope of the complaint, and would dismiss the complaint.

1. The Grievance Board did not find, and could not properly have found, that the money in the trust account belonged to the client or that Silverman had improperly converted it to his own use. When Silverman obtained the client's consent to the purchase it was not necessary separately to obtain his consent to the use of the money. The destination of the money was predetermined. The client had no right to control the money regardless of whether he or anyone purchased the property. The client's decision not to purchase the property was a well-informed decision based on independent advice, upon which he concluded that he would be "better off" not exercising the option to purchase.

2. The nature of the misunderstanding found by the board, whether the client misunderstood that he had a right to the money or did not understand that Silverman would benefit from its use, is not clear. Silverman informed the client of the purpose of the account, to purchase real property which the client was considering acquiring in partial or full satisfaction of a judgment. At the time the client declined to purchase the property he expressed his intention to write off the unsatisfied judgment as a bad debt on his income tax return. He knew the approximate amount in the account, but did not request an accounting nor did he ask that the balance in the account, less the amount owing to Silverman's law firm for legal fees, be paid to him. It is apparent that at the time he decided not to

purchase the property he did not expect to receive any of the money, and that he understood that he had no right to the money.

3. In finding Silverman guilty of misconduct the Grievance Board appears to have declared that he breached a duty to explain to his client that if he consented to Silverman's purchase of the property Silverman would obtain the benefit of the money in the trust account. However, the complaint did not allege such a breach of duty. The complaint focused on the client's claim that the money in the trust account belonged to him. An attorney may only be found guilty of misconduct as charged in the complaint. The right to a hearing includes not only an opportunity to be present at a hearing but also the right to know in advance the charges that one is expected to answer and time to prepare and present evidence in response. Those rights are denied if new issues are injected by the panel when it writes its findings and conclusions. The gist of the client's request for investigation, of his testimony, and of the complaint was that the respondent was a dishonest, incompetent and negligent lawyer. Those were the charges against which the respondent was prepared to defend, and which the panel concluded were insubstantial. The complaint failed to inform the respondent that he had to defend against a theory that a lawyer has a duty not only to represent a client competently, diligently, and with integrity but also to avoid creating misunderstanding that might prompt the client to have a bad impression of the lawyer or of the profession generally. It would be inappropriate to sustain discipline on this unalleged basis when the presentations of both sides were directed to the specific charges in the complaint.

4. This is not a case where the lawyer failed to respond when the client complained. Despite explanations given by Silverman to the client and his lawyers, the client was dissatisfied and complained to the State Bar Grievance Administrator, asserting that Silverman had cheated him. One wonders whether any further explanation would have satisfied the client. Silverman acted unwisely in assuming obligations to so many people, his client, the judgment debtors, the vendors, and the sub-vendees, without better documentation of the rights, duties and interests of the parties and of his obligation as escrow agent. His position was compromised by his purchase of an interest in the property, albeit with the client's consent. The question is not, however, whether he acted wisely but whether he was guilty of misconduct. No opinion is intimated on the scope of his obligation of explanation or disclosure or whether, if there had been

a misunderstanding, it could be a proper basis for discipline by the Grievance Board.

5. In finding that Silverman had a duty of disclosure of the benefit he would derive from use of the money in the trust account the Court implicitly decides an important and novel question, apparently without recognizing or contemplating policy considerations or the implications of its decision and without providing any guidance for the future to the legal profession or to the Grievance Board. The affirmative duty of disclosure so found is without regard to whether the client is injured by the non-disclosure, and the scope of the duty is determined not only by the need of the client to know so that he may make an informed decision, but also by the need of the legal profession to protect itself against misunderstanding by clients and resulting embarrassment of the profession. In this case it could not be suggested that Silverman withheld information that the client needed to know in order to decide whether to purchase the property. What, then, is the lawyer's affirmative duty of explanation to avoid misunderstanding that would embarrass the profession? The finding of such a duty raises many questions about when there is such a duty and how it may be determined that the duty has been breached, none of which were addressed by the panel, the Grievance Board, or the Supreme Court.

6. A lawyer cannot be expected to explain things he fairly believes his client understands. The Grievance Board did not indicate that it had considered whether Silverman could reasonably believe that no further explanation was needed. It simply decided that the client reasonably misunderstood and his misunderstanding could have been avoided if the respondent had made an additional explanation. A finding that Silverman could reasonably believe that the client understood that the money would be applied to the purchase of the property with resulting benefit to him would not be inconsistent with the panel's findings and is supported by the evidence.

7. The connection between Silverman's omission to explain the benefit and the unproven assumption that the reputation of the profession has been exposed to damage by the absence of precedent full explanation has not been explained. The record indicates that the cause of the client's displeasure with Silverman was not Silverman's failure to make an explanation of what the client could readily have perceived, but, rather, loss of confidence in Silverman in a tax matter and the events which followed. While the client had a sense of grievance and a poor opinion of Silverman and may have also had a poor opinion of

the profession for not righting his mistaken grievance, the absence of precedent full explanation was not a cause in fact of whatever obloquy, contempt, censure or reproach of the profession or of the courts resulted. This is the first time that such an affirmative duty of explanation has been imposed on a lawyer. It would be more appropriate to give this rule prospective effect and to simply instruct (or, possibly, caution) Silverman that he should conduct himself in accordance with the rule.

### OPINION OF THE COURT

1. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS.

   The function of the Supreme Court in grievance proceedings is to determine whether the State Bar Grievance Board's findings have proper evidentiary support on the whole record; the members of the State Bar Grievance Board and its hearing panels are fact-finders, not the Court.

2. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — TRUST ACCOUNTS — FIDUCIARY DUTY.

   An attorney may properly be disciplined for professional misconduct where there was ample evidence from which a hearing panel of the State Bar Grievance Board could conclude that the attorney's client did not understand the attorney's explanation of his use of a trust account in the purchase of certain real property for himself and that the attorney did not take reasonable means to explain the legitimacy of his actions; the explanation should have been given to the client to preclude his concluding that his lawyer had served the attorney's own purposes but not his client's, thereby bringing the entire legal profession into obloquy, contempt, censure and reproach (State Bar Rule 15, § 2[2]; GCR 1963, 953[2]).

### DISSENTING OPINION BY LEVIN, J.

3. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — TRUST ACCOUNTS — FIDUCIARY DUTY.

   *A lawyer cannot be disciplined for professional misconduct for failure to explain to a client his use of money in a trust account in the purchase of certain real property for himself after the client had declined to buy the property where, whatever the deficiencies in the lawyer's explanation to the client, the client understood that he would not be receiving money from the account and did not misunderstand the use of the trust account, and had no right to direct that the money be used in a manner other than as it was used.*

4. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — COMPLAINT — NOTICE OF CHARGES.

*A lawyer cannot be disciplined for failing to make explanations to his client regarding the benefit the lawyer would derive from a predetermined use of trust funds, nor can he be disciplined for failing to obtain the client's consent to the use of funds which did not belong to the client, where such conduct was not fairly within the allegations of the complaint against which the attorney was prepared to defend.*

5. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — COMPLAINT — NOTICE OF CHARGES.

*A lawyer may only be found guilty of misconduct as charged in the complaint.*

6. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — NOTICE OF CHARGES.

*The right of a lawyer who is charged with professional misconduct to a hearing includes not only the right to be present at a hearing but also the right to know in advance the charges that the lawyer is expected to answer and time to prepare and present evidence in response.*

*Eugene N. LaBelle* for Attorney Grievance Commission.

*Howard & Howard, P.C.* (by *John W. Allen),* for respondent.

RYAN, J. This is an appeal from an order of the State Bar Grievance Board which adopted a Hearing Panel's finding that petitioner Silverman's conduct caused "reasonable misunderstanding and disapproval" on the part of his client, Russel Sebright, thereby exposing the "legal profession to obloquy, contempt, censure and reproach" in violation of Supreme Court Rule for the State Bar 15, § 2(2)[1] and affirmed a 30-day suspension.

In February of 1971, Sebright hired Silverman to collect on a note owed to Sebright by Green, Inc. Silverman instituted a suit against Green, Inc.

---

[1] Now GCR 1963, 953(2).

as the principal obligor and John Fair, an individual, as guarantor and on May 3, 1971, a default judgment of $5,045.95 was entered against both defendants. Green, Inc. was without assets. Silverman, therefore, garnished Fair's only apparent accessible asset, a checking account amounting to $336.74.[2] Supplementary proceedings were then instituted to determine whether Fair had other assets.

Fair and his wife revealed that they had a land contract vendee interest in property in St. Joseph County. The Fairs agreed to assign their land contract purchaser's interest in blank, pending Sebright's decision whether to accept their interest as satisfaction of the judgment.

The property had been divided into three parcels and the Fairs had resold two of the parcels on second land contracts. Silverman's investigation disclosed that the subvendees were current on their contract with the Fairs but that, as of November 1, 1971, the Fairs were in default in excess of $1,800 on their contract with David T. Kingman and Jean E. Kingman, the vendors.

The subvendees were requested by Silverman to forward their subsequent payments on the land contract to him. Confirmation letters were sent to the subvendees and Sebright explaining that the money would be held by Silverman as escrow agent, pending the completion of the sale of the property. Silverman deposited the payments in a trust account designated "River Properties".

The Kingmans' consent to the assignment by the Fairs was required by the contract. They conditioned their consent upon the default being cured. Fair was only able to raise $300 of the $800 that

---

[2] The $336.74 was used to offset Sebright's indebtedness to Silverman's firm.

Silverman had told him was needed to bring the contract up to date. Fair's check in the amount of $300, marked "Payments on Kingman Property" was deposited in the trust account.

Subsequently, the Kingmans decided to require full payment of the balance as a condition of their consent to the assignment. The balance was not paid and the Fairs' interest in the contract was forfeited. The Kingmans, however, were willing to sell the property for the unpaid balance and interest.

After approximately 11 months, Sebright decided not to purchase the property and consented to Silverman purchasing it. Silverman did so in September, 1972. Before the closing, Silverman transferred the proceeds of the trust account by check to his personal account. He then applied the $1,591.21 from the trust account toward his purchase of the Kingman property.

In February, 1972, Sebright became dissatisfied with Silverman's handling of an unrelated tax matter and retained other counsel to handle it. Silverman, however, was retained to conclude the Fair matter and one other collection matter.

In November, 1972, Sebright received a letter from Silverman requesting $470 for outstanding fees. Sebright replied that this balance should be paid from the money in the trust account. Silverman explained that the trust account was for the sole purpose of purchasing the Kingman property and that the money in the trust account did not belong to Sebright. Dissatisfied with this explanation, Sebright filed a complaint against Silverman with the State Bar.

A hearing was held before Hearing Panel No. 2 on January 6, 1978. The findings of the Hearing Panel as affirmed by the Grievance Board were:

"II. That the funds paid to respondent by the subvendees of John Fair and wife which were placed in the trust account of respondent's law firm in Kalamazoo were not properly used by respondent to acquire the interest of Mr. and Mrs. Kingman in the property and contract between the Kingmans and the *[sic]* John Fair and wife; that the impropriety on the part of respondent inhering in his use of such trust funds in his acquisition of said property consisted in his taking of such trust funds out of trust for such purpose without precedent full explanation to his client, Russel Sebright, and without obtaining from Mr. Sebright his consent to the intended use of such funds for respondent's benefit; that such precedent acts on the part of respondent were incumbent upon him irrespective of whether or not Sebright was the ultimate beneficial owner of such trust funds; and that although respondent's neglect in the foregoing regards was not intentionally wrongful such was nevertheless the efficient cause of reasonable misunderstanding and disapproval on the part of Mr. Sebright with respect to the use of such funds as to constitute a violation of Supreme Court Rule for the State Bar 15, § 2(2)."

The panel then concluded:

"I. That respondent is guilty of violating Supreme Court Rule for the State Bar 15, § 2(2) in that his aforesaid conduct exposes the legal profession to obloquy, contempt, censure and reproach."

As is seen from the foregoing, the essence of the professional misconduct of which Mr. Silverman has been found guilty is his use, for his own purposes, of trust funds which came into his hands by reason of his representation of his client, Russel Sebright, without "precedent full explanation" to his client of a) his intention to use the funds for personal gain, and b) his legal entitlement to do so.

There is no question that the funds did not

belong to Mr. Sebright and that Mr. Silverman's
ultimate use of them was lawful. The point, how-
ever, is that since the funds were generated by Mr.
Silverman only because of his representation of
Mr. Sebright and as his agent, it is understandable
that Mr. Sebright might have some trouble recon-
ciling the fact that Mr. Silverman, who was hired
to collect a debt for Sebright, wound up obtaining
$1,591.21 for himself but Sebright wound up re-
ceiving only $336.74 and a bill for attorney fees of
$470. There is an explanation for that seemingly
incongruous if not suspicious result. That explana-
tion should have been given Mr. Sebright to pre-
clude his understandably concluding that his law-
yer, under protective cover of his professional
expertise and the letter of the law, and by appar-
ent artifice and sharp dealing had served his own
purposes but not his client's, thereby bringing the
entire legal profession into obloquy, contempt, cen-
sure and reproach.

The Hearing Panel members who saw and heard
the witnesses and examined the exhibits found
that Mr. Sebright did not understand the combina-
tion of legal principles and factual developments
which justified Mr. Silverman's use of the money
for his own purposes and that Mr. Silverman did
not take reasonable means to explain the legal
legitimacy of his actions.

We are satisfied, upon a careful review of the
record, that the evidence was ample to justify that
conclusion by the panel and the Grievance Board.
The panel and Grievance Board members are the
fact-finders, not this Court. As we said *In the
Matter of Freedman,* 406 Mich 256; 277 NW2d 635
(1979), "[o]ur function in bar grievance matters is
to determine whether the State Bar Grievance
Board's findings 'have proper evidentiary support

on the whole record.' *State Bar Grievance Administrator v Estes,* 390 Mich 585, 593; 212 NW2d 903 (1973)."

The resolution by the Hearing Panel and Grievance Board members of the fact questions upon which this case turns, particularly with respect to the credibility of the witnesses, has "proper evidentiary support in the record" as has the conclusion that Mr. Silverman violated State Bar Rule 15, § 2(2).

We affirm the findings and conclusion of the Grievance Board but reduce the discipline to a reprimand and payment of costs as assessed.

COLEMAN, C.J., and WILLIAMS and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

LEVIN, J. The State Bar Grievance Board adopted a Hearing Panel's finding that Alan H. Silverman had caused a client to misunderstand and disapprove of the use of funds in a trust account and had thereby exposed "the legal profession to obloquy, contempt, censure and reproach" in violation of State Bar Rule 15, § 2(2)[1] and affirmed a 30-day suspension.[2]

---

[1] Repealed October 1, 1978; now GCR 1963, 953(2).

[2] The Hearing Panel's findings of fact, in their entirety, were:

"I. That, other than as set forth in the finding next following, respondent is not guilty of the charges preferred against him in the complaint filed in this matter.

"II. That the funds paid to respondent by the sub-vendees of John Fair and wife which were placed in the trust account of respondent's law firm in Kalamazoo were not properly used by respondent to acquire the interest of Mr. and Mrs. Kingman in the property and contract between the Kingmans and the *[sic]* John Fair and wife; that the impropriety on the part of respondent inhering in his use of such trust funds in his acquisition of said property consisted in his taking of such trust funds out of trust for such purpose without precedent full explanation to his client, Russel Sebright, and without obtaining from Mr. Sebright his consent to the intended use of such funds for respondent's benefit; that such precedent acts on the part of respondent were incumbent upon him irrespective of whether or not Se-

The trust account contained payments on property which the client was considering acquiring in partial or full satisfaction of a judgment Silverman had obtained against a debtor of the client. Silverman had arranged with the client's knowledge for the payments to be deposited in the account pending the client's decision. The client decided not to purchase the property. Silverman sought and obtained the client's permission to purchase the property himself. He did so, applying the money in the trust account toward the purchase.

The client testified that he thought the money in the account was to be applied toward satisfaction of the judgment. The Grievance Board did not find that Silverman acted improperly in the formation of the account. Nor did it find that the money actually belonged to the client. It found that the money was not properly used by Silverman only in that he did not make a "precedent full explanation" to his client or obtain his client's consent to the intended use of the funds for Silverman's "benefit" and that such conduct caused a "reasonable misunderstanding and disapproval" by the client "with respect to the use of such funds", in violation of the rule.

The pertinent allegation in the complaint was that Silverman had failed to disclose to the client that the money deposited in the trust account would be applied as payment on the judgment debtor's obligation to the vendor of the property rather than on the judgment indebtedness to the client.

---

bright was the ultimate beneficial owner of such trust funds; and that although respondent's neglect in the foregoing regards was not intentionally wrongful such was nevertheless the efficient cause of reasonable misunderstanding and disapproval on the part of Mr. Sebright with respect to the use of such funds as to constitute a violation of Supreme Court Rule for the State Bar 15, § 2(2)."

The record does not support a finding that the client misunderstood the intended use of the funds. Silverman informed the client of the purpose of the trust account. The money was used for that purpose. The money did not belong to the client and could properly have been used only for the purpose for which the account was created.

At the time the client decided not to purchase the property he expressed his intention to write off the unsatisfied judgment on his income tax return. He did not request an accounting and apparently wrote off the entire unsatisfied amount. Nor did he at any time ask that the balance in the trust account, less his indebtedness to Silverman's firm for legal fees, be paid to him. It is apparent that whatever the deficiencies in Silverman's explanation, the client understood that he would not be receiving money from the account.

Because of the limited allegations in the complaint Silverman cannot be disciplined for failing to make explanations regarding the benefit he would derive from the predetermined use of the funds, nor can he be disciplined for failing to obtain the client's consent to the use of funds which did not belong to the client.

We would vacate the order of the Grievance Board and dismiss the complaint.

I

Silverman obtained a default judgment of $5,045.95 in favor of his client, Russel Sebright, against John Fair. Silverman garnished the only apparent asset that could be reached by the judgment—a checking account amounting to $336.74. That sum less attorney's fees and expenses of

collection was credited to Sebright's indebtedness to Silverman's law firm.

Silverman instituted supplementary proceedings to determine if Fair had other assets. Silverman met with Fair and his wife in the courtroom; Sebright was not present. Fair told Silverman that he had an interest in three pieces of property, one of which was riverfront property that Fair and his wife were purchasing on land contract. The Fairs agreed to assign the land contract in blank pending Sebright's decision, after investigation, whether to accept their interest as partial or full satisfaction of the judgment.[3]

The property had been divided into three parcels with a cottage on each. Silverman's investigation disclosed that the Fairs had resold two parcels on second land contracts and had been collecting from the sub-vendees but not paying the vendors. As of November 1, 1971, the contract was in default in excess of $1,800.

Silverman informed the sub-vendees that his client was considering the purchase of the Fairs' interest. To avoid further default, Silverman requested the sub-vendees to make their payments to him. The arrangement was confirmed in letters, acknowledging receipt of payments, and explaining that the money would "be held by this firm as escrow agent pending the completion of the negotiations and closing of the sale of the property". As received, the payments were deposited in a trust account designated "River Properties". Sebright received copies of the letters.

Silverman communicated with the vendors

---

[3] Silverman testified that the agreement with Fair was that if Sebright agreed to assume the Fairs' interest in the property the judgment would be satisfied to the extent of the Fairs' equity. Fair testified that if Sebright accepted the Fairs' interest it would be in full satisfaction of the judgment.

through their lawyer and requested their approval, as required by the land contract, of an assignment from the Fairs to Sebright. The vendors refused to approve the assignment unless the default was cured. Silverman informed Fair that to cure the default he would have to come up with $800. Fair said he could raise $500, but ultimately produced only a $300 check.[4] Fair marked the check, drawn on a corporate account, "Payments on Kingman Property".[5] The check was deposited in the trust account.

In the meantime, the vendors had changed counsel and the conditions for obtaining their consent to an assignment. They demanded that the balance on the contract be paid in full and expressed an intention to continue with steps they were taking to forfeit the contract. The contract was forfeited and the Fairs' interest came to an end. The vendors were, nevertheless, willing to sell the property for the amount of the unpaid balance of principal and interest.

Sebright applied for a mortgage loan. In July, 1972, he decided not to purchase the property. He testified that he told Silverman that for a number of reasons he did not consider the investment worthwhile and that he would "be best off with writing it off my income taxes as a bad loan". Silverman then asked Sebright if he thought it would be a good deal for him and if Sebright would object to his purchasing the property. Sebright said that he had no objection to his doing so.

In August, Silverman decided to purchase the property, transferred the $1,591.21 from the trust

---

[4] The check was drawn on the account of a corporation in which Fair was the principal shareholder; the assets of the corporation were not subject to garnishment for satisfaction of the judgment.

[5] The Kingmans were the vendors.

account to his personal account and used it toward the purchase of the property in September.

Sebright had, in February, 1972, become dissatisfied with Silverman's handling of a tax matter and, with Silverman's knowledge, had retained other counsel to handle it. Although Sebright had lost confidence in Silverman's legal ability, he decided to let him conclude the Fair and one other collection matter.

Silverman made no charge for services in respect to the Fair matter other than on account of the $336.74 actually collected. Sebright owed $470 on the tax matter and received monthly billings starting in February.

In November, Silverman wrote Sebright requesting payment of the $470. Sebright replied that this balance should be paid with the money in the account. Silverman explained that the account was for the sole purpose of acquiring the riverfront property and that the money was not Sebright's.

Sebright ultimately filed a complaint with the State Bar.

## II

Whether Silverman acted improperly in his dealings with the Fairs or sub-vendees is not at issue. After Sebright's testimony on direct examination the chairman of the hearing panel said that the allegations of misconduct would be limited to the "propriety or lack thereof which attended the handling of the trust account * * * at the time the deposits were made and at the time that trust balance * * * was closed out and presumably transferred to Mr. Silverman".[6]

---

[6] "[Chairman]: I would like to state this, however, and this seems an appropriate time. I believe that the concluding portion of Mr. Sebright's testimony, as it was given at the time of the recess, rather

Sebright testified that the money in the trust account should have been paid on Fair's indebtedness to him.

It was Silverman's position that the money in the account was to be applied toward purchase of the property, without regard to who purchased it. If no one purchased it, the money would then be paid to Fair's vendors.

The sub-vendees made the payments on Silverman's representation that the money would be paid to Fair's vendors to be applied on the first land contract. They had no obligation to Sebright. Because the check from Fair was drawn on a corporate account and labeled "Payments on Kingman Property" it could not have been otherwise reached by the judgment.[7]

---

clearly if not eloquently states the nature of the real grievance that he has in this matter, and that grievance relates, as I understand it, to nothing else than the propriety or lack thereof which attended the handling of the trust account in the firm of which *[sic]* Mr. Silverman was associated at the time the deposits were made and at the time that trust balance with the firm was closed out and presumably transferred to Mr. Silverman.

"All the other material, the past dealings preceding that point in time, all that occurred since that point in time, is at best, in my judgment and in the judgment of the panel, background. We don't have any issue here now, if we ever did before, as to whether or not there was any impropriety in the matter of the land contract acquisition by Mr. Silverman and his dealings with the Fairs and so forth. That is of importance, as we see it, only by way of background and as it bears upon propriety or lack thereof in the handling of the trust account.

"Certainly, that is the sense of the panel at this point. If there are any objections to that characterization of the case as it now stands, we'll now listen to them."

There were no objections.

*"[Chairman]:* * * * I again don't want to interrupt, but in view of the fact that you and [the board's lawyer] are advised that we have reduced the allegations we consider to be in issue in this matter, as a result of the witness's testimony, would you adjust your examination bearing that in mind? For example, we are not at all interested in whether or not there was any impropriety in his taking the contract interest. That is not in issue any more, if it ever was. Again, we're interested only in the propriety of the trust account transactions."

[7] See fn 4, *supra.*

The money in the account could properly have been paid only to the vendors or, possibly, returned to the sub-vendees or the Fairs. The Grievance Board did not find, and could not properly have found, that the money in the account belonged to Sebright or that Silverman had improperly converted it to his own use.

Silverman requested and obtained Sebright's permission to purchase the property. If Silverman had asked for Sebright's consent to the use of the money and Sebright had refused, the money would not have been paid to Sebright. If Silverman had decided to purchase the property after the money had been paid to the vendors, the purchase price would probably have been reduced by the amount so paid. The net result would have been the same as Silverman applying the money toward the purchase.

When Silverman obtained Sebright's consent to the purchase it was not necessary to separately obtain his consent to the use of the money. The destination of the money was predetermined. Sebright had no right to control the money regardless of whether he or anyone purchased the property.

Sebright's decision not to purchase the property was a well-informed decision based on independent advice. Sebright acknowledged that Silverman told him in discussions in March-May, 1972 that there was "between $1,000 and $1,500 in the escrow account to apply against" the cost of acquiring the property and had urged him to buy the property. Sebright had the property appraised. On the advice of his banker he concluded that he would be "better off not exercising my option to purchase the property".

### III

The Grievance Board, adopting the Hearing Panel's decision, found that "irrespective of whether or not Sebright was the ultimate beneficial owner", Silverman had a duty to fully explain the intended use of the money for Silverman's "benefit" to Sebright and to obtain his consent to such use and that Silverman had breached those duties, causing a "reasonable misunderstanding and disapproval on the part of Mr. Sebright".

The nature of the "misunderstanding" found by the board was not explicitly stated in its findings. It is unclear whether the board found that Sebright misunderstood that he had a right to the money or that he did not understand that Silverman would benefit from the use of the money paid to the vendors of the property. We turn first to a consideration of misunderstanding regarding Sebright's right to the money, and in Part IV will consider misunderstanding regarding the benefit to Silverman from the use of the money.

Sebright was informed of the purpose of the account.[8] The purpose of the account and, hence, the ultimate use of the money was determined when it was opened. All funds were earmarked for application to the land contract. At the time the sub-vendees' payments were deposited, Silverman sent copies to Sebright of the letters addressed to the sub-vendees explaining that the money would be held in escrow "pending the completion of the negotiations and closing of the sale of the property".[9] Sebright did not remember receiving the

---

[8] See fn 9, *infra,* and accompanying text.

[9] The substance of the letters read:
"Dear _____
"I am in receipt of your checks numbered _____ and _____, both in the amount of _____ Dollars representing your _____

letters until he sought to initiate an action against Silverman and attempted to reconstruct the situation. He then found the letters and possibly other correspondence in his files. He paraphrased the correspondence as stating that the money would "be applied to the underlying land contract" and said "[w]hen I went back, reconstructing it in retrospect, when I read it carefully, yes, it explains that it was going into an escrow account".

When Sebright told Silverman that he did not desire to purchase the property he expressed his intention to write the Fair note off on his income tax return and testified that he did write it off.[10] He testified that at the time he knew there was

---

and _____ payments on your land contract with Mr. and Mrs. John Fair. These checks have been deposited in this firm's trust account and will be held by this firm as escrow agent pending the conclusion of the negotiations and closing of the sale of the property.

"As soon as the sale has been concluded you will be so informed. Thank you for your patience and cooperation.

                              "Very truly yours,

                              "Alan H. Silverman".

[10] Sebright testified:

"The property was too far away. There was—I had to look at it from the consideration of, if I bought it at between $11,000 and $12,000, to actually realize a return on the $5,000 I had, I had to add that to it, which would come up to around $17,000, $18,000, that I would have to be able to sell it for. I said that after talking to the banker that I had come to the conclusion that I'd probably be best off with writing it off my income taxes as a bad loan.

                    *    *    *

"I said, 'Yes. If that's it, that's it.' If they don't have any money, this is the only thing they've got, you know, what else could I do? 'I'll write it off.' And that can be verified, that I did write it off, by my income taxes, because the IRS didn't believe it and audited me.

                    *    *    *

"Q. Your judgment was uncollectable? You wrote it off your income taxes as a bad debt?

"A. Right. The judgment was satisfied.

                    *    *    *

"And if it would be necessary, I can show you that I claimed the loss on that year's income taxes."

over $1,000 in the account. He did not subsequently ask Silverman for a statement of the exact amount in the account, nor did he ask for an accounting when he received the monthly billing statements from the law firm for $470 on the tax matter. If Sebright had thought that the money in the account was to be applied toward satisfaction of the judgment he could not properly have written off the unsatisfied amount without deducting the amount in the account to be applied on the judgment and should have requested a statement so that he would know the appropriate amount to declare as unsatisfied. Also, having in mind that Sebright contemplated no further business with Silverman, if he thought Silverman had money belonging to him he would have asked Silverman to remit the difference between the amount in the account and the amount owing Silverman's law firm.

It is apparent that at the time Sebright decided not to purchase the property he did not expect to receive any of the money. Silverman's explanation, whether deficient or not, was adequate to avoid Sebright misunderstanding that he had a right to the money.[11] Sebright understood that he had no such right.

IV

In finding that Silverman was guilty of miscon-

---

[11] If Sebright had in fact misunderstood that he did not have a right to the funds, Silverman's failure to more fully explain to Sebright might have been a cause of misunderstanding by Sebright. Such a case would present different questions. We are inclined to think that a lawyer should not be disciplined because his explanation, although adequate to avoid actual misunderstanding, was so deficient that a reasonable person *might* have misunderstood. To hold otherwise would mean that lawyers would have to formalize their communications with their clients and conform to some objective standard without regard to the adequacy in fact of their communication with the client, perhaps being required to give the same explanation to the most sophisticated as would be given to the least sophisticated.

duct in causing "reasonable misunderstanding and disapproval on the part of Mr. Sebright" the Grievance Board appears to have declared that Silverman breached a duty to explain to Sebright that if he consented to Silverman's purchase of the property Silverman would obtain a benefit from the money in the trust account.

## A

Silverman urges, and we agree, that the complaint did not allege such a breach of duty.

The complaint alleged specific breaches of duty. None relates to a claim that Silverman failed to explain that he would benefit from the use of the trust account funds. The only arguably pertinent allegations concern Silverman's failure to cause the money in the trust account to be paid to Sebright or to advise him that the money would not be paid to him but to the vendors under the land contract.

The complaint focused on Sebright's claim that the money in the account belonged to him. It did not allege as an alternative theory that if it were determined that the money did not belong to Sebright, Silverman was nevertheless guilty of wrongdoing in failing to apprise Sebright of the benefit that would result to Silverman from payment of the money in the trust account to the persons to whom it was paid. It was not alleged that Silverman had breached a duty in paying money from the trust account "without precedent full explanation to his client, Russel Sebright, and without obtaining from Mr. Sebright his consent to the intended use of such funds for respondent's benefit".

This Court has repeatedly emphasized that "[a]n attorney may only be found guilty of misconduct as charged in the complaint".[12] It is vitally important that the inquiry at a grievance hearing and the findings of the panel be confined to the specific charges. The right to a hearing includes not only an opportunity to be present at a hearing but also the right to know in advance the charges that one is expected to answer and time to prepare and present evidence in response. Those rights are denied if new issues are injected by the panel when it writes its findings and conclusions.

The complaint charged that Silverman owed Sebright the duties of (1) endeavoring to obtain full knowledge of Fair's assets "before advising Sebright regarding a course of action designed to satisfy the debt owed his client by Fair", (2) refraining from conduct "involving fraud, deceit and/or misrepresentation", (3) refraining from "acquiring a proprietary interest in the subject matter of his client's litigation or contemplated litigation", (4) "represent[ing] Sebright competently", and (5) segregating his client's funds and promptly notifying his client of his receipt of the funds paid counsel "for the benefit of Sebright and pay them to his client".

The complaint asserted that in violation of those duties Silverman had committed certain specific breaches in that he had "willfully and/or negligently" failed (1) to "discover and advise Sebright" that property pledged to secure the debt "was unencumbered and of sufficient value to satisfy the

---

[12] *State Bar Grievance Administrator v Jackson*, 390 Mich 147, 155; 211 NW2d 38 (1973). Similarly, see *State Bar Grievance Administator v Freid*, 388 Mich 711; 202 NW2d 692 (1972) ("It is a fundamental rule of due process that a person must have notice of the charges against him."); *State Bar Grievance Administrator v Corace*, 390 Mich 419, 425; 213 NW2d 124 (1973).

judgment", (2) "to disclose the full details of the contracts between Fair and the others pertaining" to the property sold on land contract in that "the monthly sub-contract payments to Fair from his purchasers exceeded the amount of the monthly payments required to discharge Fair's obligation to his vendor" and "the payments from Fair's vendees were being applied by [Silverman] to the obligation of Fair to his vendor rather than to the indebtedness of Fair to Sebright", (3) to "advise Sebright that the $300 paid him by Fair was applied to the obligation of Fair to his vendor rather than to Fair's indebtedness to Sebright" and (4) "[t]o account to Sebright for the sums paid him by Fair and by Fair's vendees for the benefit of Sebright".

The complaint alleged that the conduct violated the following canons and disciplinary rules:

—Canon 1 (A lawyer should assist in maintaining the integrity and competence of the legal profession) and DR 1-102(A)(4) (A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation).

—Canon 5 (A lawyer should exercise independent, professional judgment on behalf of a client) and DR 5-103(A) (A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client).

—Canon 6 (A lawyer should represent a client competently) and DR 6-101(A)(3) (A lawyer shall not neglect a legal matter entrusted to him).

—Canon 7 (A lawyer should represent a client zealously within the bounds of the law) and DR 7-101(A)(2) (A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services).

—Canon 9 (A lawyer should avoid even the appearance of professional impropriety) and DR 9-102, subds (A) and (B), (1) and (4) (requiring a lawyer to deposit all funds of a client in an identifiable bank account and to "promptly notify a client of the receipt of his funds, securities or other properties" and to "[p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive").

—Supreme Court Rule for the State Bar 15, § 2, subds (2)-(4), stating that a lawyer may be disciplined for conduct (1) "that exposes the legal profession or the courts to obloquy, contempt, censure or reproach", (2) that "is contrary to justice, ethics, honesty or good morals", or (3) that "violates the standards or rules of ethics or professional responsibility adopted from time to time by" this Court.

The board found that Silverman was not guilty of the specific breaches stated or of violation of any canon or disciplinary rule or the State Bar Rule except that he had exposed the profession to obloquy, contempt, censure or reproach when he failed to make precedent full explanation of the benefit to him, causing reasonable misunderstanding and disapproval.

Indeed, the board could not have properly found any specific breach. Contrary to the portion of the complaint alleging specific breaches of duty, Silverman did disclose to Sebright that "the payments from Fair's vendees" would be applied "to the obligation of Fair to his vendor rather than to the indebtedness of Fair to Sebright"; he did advise Sebright that the $300 paid by Fair would be "applied to the obligation of Fair to his vendor rather than to Fair's indebtedness to Sebright". The moneys were so paid and, when Sebright

inquired in November, 1972, he was so informed, and Silverman thereby "account[ed] to Sebright for the sums paid him by Fair and by Fair's vendees".

The gist of Sebright's request for investigation, of his testimony and of the complaint was that Silverman was a dishonest, incompetent and negligent lawyer. These were the charges against which Silverman prepared to defend.

Silverman succeeded in convincing the hearing panel that he had not acted dishonestly, incompetently or negligently and that all the specific allegations of wrongdoing were insubstantial. Having so concluded, the panel shifted from whether Sebright had been injured by incompetent, negligent or dishonest counsel to whether his sense of outrage was justified.

The complaint, however, failed to inform Silverman that he had to defend against the somewhat novel theory that a lawyer has a duty not only to represent a client competently, diligently and with integrity but also to avoid creating misunderstanding that might prompt the client to have a bad impression of the lawyer or of the profession generally.

Nor, perhaps more pertinently, did the complaint inform Silverman that even if he explained to Sebright, at the time he consented to Silverman purchasing the property, that the money did not belong to him and would be paid to Fair's land contract vendors, he might yet be disciplined because he failed to explain to Sebright that such use of the funds would benefit Silverman.

In sum, the complaint did not allege that Silverman had a duty to particularize or spell out to Sebright that the "intended use of such funds" would benefit Silverman, and that a consent ob-

tained following an explanation from which it might appear to Sebright that Silverman would benefit was nevertheless not properly obtained.

It is inappropriate to sustain discipline on this unalleged basis when the presentations of both sides were directed to the specific charges.[13]

## B

This is not a case where the lawyer failed to respond when the client complained. When Sebright complained asking why Silverman did not use the trust account funds to satisfy Sebright's

[13] I question whether, as a policy matter, this Court should countenance such a charge even were it specifically stated in the complaint. To allow such charges may encourage hearing panels and the Grievance Board to compromise on the critical issues of the lawyer's alleged incompetence, negligence and dishonesty and settle on a finding concerning the cosmetics of the matter—the lawyer was not guilty of the misconduct which caused the client to complain but should have handled the lawyer-client relationship more carefully so as to avoid giving the client the impression, albeit erroneous, that there was cause for complaint.

Such compromises would be a disservice to the profession and the public. When the client's grievance is that the lawyer is negligent, dishonest, or incompetent, discipline should only be imposed when the lawyer is found guilty of such wrongdoing. The Grievance Board should not attempt to mollify the client's sense of wrong by disciplining the lawyer who successfully defends against the client's misplaced grievance.

There will be few cases where a lawyer charged with a grievance could not be seen by a Monday morning quarterback as having made some omission in disclosure or explanation that caused the client to bring the charge. If a lawyer may be disciplined although the client was wrong in making the charge, because the client was not unreasonable in thinking that the lawyer acted wrongly, lawyers may conclude that they should placate the client lest the Grievance Board, in an effort to protect the profession from obloquy or reproach, discipline the lawyer because the complaint should have been forestalled.

The decisions of the Grievance Board are not presently appealable as of right to any court. This means that no court is obliged to review the record. And where appeal is granted, the review of factual findings is generally limited. Under these circumstances it is especially important to confine the inquiry to the controversy which engendered it.

indebtedness to the law firm, in effect asserting that the money in the trust account belonged to him, Silverman promptly responded. Before the request for investigation was filed Silverman explained what had occurred to lawyers to whom Sebright had gone to complain of Silverman. Despite explanations Sebright was dissatisfied and complained to the grievance authorities asserting that Silverman had cheated him. One wonders whether under these circumstances any further "precedent full explanation" would have satisfied Sebright.

## C

This opinion has, to this point, been written without reliance on Silverman's testimony. Only the complaint, Sebright's testimony, the exhibits and the panel's findings have been considered.

When Silverman's testimony is taken into account, the limited scope of the panel's finding and that they are not fairly within the allegations of the complaint becomes apparent.

Silverman testified he believed that when he asked Sebright whether he had any objection to his purchasing the property he told him that the money in the trust account would be paid to Fair's land contract vendors.

Silverman was not asked whether he explained to Sebright the benefit that would flow to him from such an application of the funds and gave no testimony in that regard.

The panel did not find that Silverman failed to make precedent full explanation and obtain Sebright's consent "to the intended use of such funds". Rather it found that he failed to make such explanation and obtain his consent "to the

intended use of such funds *for respondent's benefit*". (Emphasis supplied.)

What emerges is that the panel was not prepared to find that Silverman testified falsely when he said he believed that at the time he obtained Sebright's consent to his purchase of the property he told him that the money in the trust account would be paid to the land contract vendors. But Silverman had not claimed that he had particularized or spelled out for Sebright that such use of the funds would benefit Silverman. The panel apparently concluded that his failure to do so may explain Sebright's grievance; since lawyers owe their clients a high degree of duty Silverman should have gone further and spelled out the benefit in so many words; he should be disciplined because his failure to do so caused reasonable misunderstanding with consequent embarrassment to the profession.

The panel overlooked, as did the Grievance Board when Silverman's counsel brought this to its attention, that its findings based on failure to spell out the benefit were beyond the issues framed by the complaint or which had been tried.

### D

Silverman acted unwisely in assuming obligations to so many people—his client, the Fairs, the vendors and the sub-vendees—without better documentation of the rights, duties and interests of the parties and of his obligation as escrow agent. His position was compromised by his purchase of an interest in the property, albeit with his client's consent. The question before us is not, however, whether he acted wisely but whether he was guilty of misconduct.

We intimate no opinion regarding the scope of Silverman's obligation of explanation or disclosure or whether, if there had been a misunderstanding, it could be a proper basis for discipline by the board.

## V

## A

The opinion of the Court raises the spectre of misuse of "trust funds" "for personal gain", of Silverman obtaining $1,591.21 "for himself", of a "seemingly incongruous if not suspicious result", and of a lawyer serving "his own purposes" and not his client's "under protective cover of his professional expertise and the letter of the law, and by apparent artifice and sharp dealing". It is also suggested that the matter was complicated: a "combination of legal principles and factual developments" justified Silverman's use of the money.[14]

The Court characterizes the panel's decision as finding Silverman guilty of the use "for his own purposes" of trust funds without precedent full explanation to Sebright of his intention to use the funds "for personal gain" and of his legal entitlement to do so.

The implication is that Silverman had the right to make alternative uses of the money and chose a use which would serve his own purposes and result in personal gain. The panel did not so find.

The use of the money was predetermined. If Silverman purchased the property, the predetermined use would necessarily benefit him. That

---

[14] The reference to the $470 bill for attorney fees ignores that this bill was for services other than on the Fair collection matter. Silverman did not charge $470 or, indeed, any amount for collecting the $1,591.21.

benefit was not characterized by the panel as a use "for his own purposes" or as "personal gain"; it said, non-pejoratively, that Silverman should have explained the intended use of such funds for his "benefit".

The panel's description carries with it no implication that Silverman made a decision to serve his own purposes. Having in mind that the use of the funds was predetermined and that Silverman had no significant choice in their use,[15] the panel's statement is more consonant with that fact than is the Court's characterization.

The Court again characterizes the matter differently than did the panel when it states that Sebright could understandably conclude that Silverman "under protective cover of his professional expertise and the letter of the law, and by apparent artifice and sharp dealing had served his own purposes but not his client's". The panel did not find that Sebright so concluded, understandably or not.

The panel spoke of "reasonable misunderstanding and disapproval". It did not describe the nature of the misunderstanding. It did not find that Sebright concluded that Silverman had acted under protective cover of his professional expertise or the letter of the law or that there was apparent artifice and sharp dealing, nor did it find that Sebright concluded that Silverman served his own purposes but not Sebright's. It simply found that Sebright "reasonably misunderstood and disapproved".

---

[15] The funds had to be paid to the land contract vendors or, possibly, returned to the sub-vendees or Fair. Since all but $300 of the $1,591.21 had been provided by the sub-vendees, returning the money to them would have had the same effect as paying it to the vendors insofar as benefit to Silverman is concerned. The sub-vendees were obliged to pay any amount returned to whomever took over the Fair's position, as well as the balance owing on their contracts, in order to obtain a deed.

## B

The Court states that the hearing panel members who heard and saw the witnesses and examined the exhibits "found that Mr. Sebright did not understand" that Silverman's use of the money "for his own purposes" was "justified" and that Silverman "did not take reasonable means to explain the legal legitimacy of his actions". It states that the resolution "of the fact questions upon which this case turns, particularly with respect to the credibility of the witnesses, has 'proper evidentiary support in the record' ", and therefore should be affirmed.

The reference to the superior opportunity of the hearing panel members to see and hear the witnesses suggests a factual dispute in the testimony. This was not, however, a swearing contest between Silverman and Sebright. There was no significant conflict in their testimony.

The only issue of credibility relates to whether Sebright spoke truthfully when he testified that he thought the money in the trust account—which all agree could not be paid to him—would be paid to him.

I conclude, on the basis of Sebright's testimony, that he did not expect that the money would be paid to him. The panel made no contrary finding.

## C

Since I conclude that Sebright did not misunderstand his lack of entitlement to the money in the trust account, and that Silverman's failure to avoid misunderstanding by precedent full explanation of the benefit he would derive from the use of the money was not fairly within the allegations of

the complaint, I found no need to express any opinion whether Silverman was guilty of misconduct.[16]

The opinion of the Court, however, in finding that Silverman had a duty of disclosure implicitly decides an important and novel question, apparently without recognizing or contemplating policy considerations or the implications of its decision and without providing any guidance for the future to the profession or the Grievance Board.

The Court implicitly decides that a lawyer has an affirmative duty of disclosure to his client without regard to whether the client is injured by the non-disclosure, and that the scope of that duty is determined not only by the need of the client to know so that he may make an informed decision, but also by the need of the profession to protect itself against misunderstanding by clients and resulting embarrassment of the profession.

This is not a case of a lawyer failing to provide requested information until after the client complained to the Grievance Board. Silverman promptly responded to all of Sebright's inquiries.

It is not suggested, nor could it be, that Silverman withheld information that Sebright needed to know in order to decide whether to purchase the property. Sebright stated in a letter complaining about Silverman that before he decided not to purchase the property he was aware that there

---

[16] The disposition which I believe to be correct makes it unnecessary to express an opinion whether Silverman was guilty of misconduct and I have not done so. On the contrary, I have stated that no opinion is being expressed regarding the scope of his obligations of explanation or disclosure.

The basis of my conclusion that no discipline can properly be imposed is that Sebright did not misunderstand and think that the money in the trust account belonged to him and that other findings of the board—that Sebright misunderstood the benefit to Silverman from the use of the funds—were not fairly within the allegations of the complaint.

was $1,000 to $1,500 in the trust account that could be applied toward its purchase. Nor is this a case of a lawyer creating an opportunity for profit for himself. It is apparent on this record that Silverman urged Sebright to buy the property and considered doing so himself only when Sebright decided, on independent advice, not to do so.

Sebright, thus, had all the information he needed to decide whether to purchase the property and the asserted failures to disclose caused him no financial injury as none of the money could properly have been paid to him. If it were not applied to the purchase of the property it had to be either paid to the land contract vendors or, possibly, returned to the sub-vendees and Fair.

What, then, is the lawyer's affirmative duty of explanation to avoid misunderstanding that would embarrass the profession? Does such an affirmative duty apply to the entire relationship between lawyer and client, only to cases where the lawyer obtains an opportunity as a result of representing the client, or to only those opportunities where, as here, funds are collected which cannot be paid to the client but can be used to facilitate a transaction in which the client declines to participate and the lawyer does participate?

If there is such an affirmative obligation of explanation to avoid misunderstanding that would embarrass the profession, should the focus be on whether the client reasonably misunderstood or on whether the lawyer could reasonably be expected to anticipate client misunderstanding?

What is the standard by which embarrassment of the profession is to be determined? What conduct of an individual lawyer exposes the legal profession or the courts to "obloquy, contempt, censure or reproach"? In the instant case, which of

those words are applicable? In finding that such embarrassment resulted, what evidence is relied on? Is it enough that a client filed a request for investigation?

None of those questions were addressed by the panel, the Grievance Board or this Court. Nor does the Court consider Silverman's constitutional challenge based on asserted vagueness of Supreme Court Rule for the State Bar 15, § 2.

Without deciding what general duties of affirmative explanation a lawyer has to his client and acknowledging that there might be a special duty in circumstances where the lawyer stands to benefit, I would be inclined to conclude that a lawyer cannot be expected to explain things he fairly believes his client understands.

The Grievance Board did not indicate that it had considered whether Silverman could reasonably believe that no further explanation was needed. It simply decided that Sebright reasonably misunderstood and his misunderstanding might have been avoided if Silverman had made an additional explanation.

A finding that Silverman could reasonably believe that Sebright understood that the money would be applied to the purchase of the property with resulting benefit to Silverman would not be inconsistent with the panel's findings and is supported by the evidence.

Silverman had informed Sebright that there was $1,000 to $1,500 in the trust account which had been paid largely by the sub-vendees (and thus did not belong to Sebright), and that it was being held to purchase the property. The focus was on the additional money needed to close—the amount of the mortgage that could be obtained and the additional cash required. Silverman could reasonably

have thought that after Sebright told him that he decided not to purchase the property and Silverman asked him whether he thought it was a good deal for Silverman, Sebright, a businessman, understood that Silverman expected to close the very same deal and in the same manner that he had proposed for Sebright, and that no further explanation was required to avoid misunderstanding.

Moreover, as previously noted, Silverman testified he believed that when he obtained Sebright's consent to purchase the property he told him that the money in the trust account would be paid to the land contract vendors. The panel made no finding that he testified falsely; its findings are consistent with the view that such testimony was truthful and, indeed, implicitly avoid any declaration on whether his testimony was truthful or not. Absent a finding that Silverman spoke falsely, it would be proper to conclude that he could reasonably believe that Sebright would understand, without further explanation, that the payment of the money to the vendors would result in a benefit to Silverman should he purchase the property pursuant to the consent given.

### D

I am unpersuaded that the amount of obloquy, contempt, censure or reproach of the profession or of the courts that would be avoided by the imposition of an affirmative duty of "precedent full explanation" outweighs the cost to members of the profession, to say nothing of the cost to clients constrained to listen to the unsolicited precedent full explanation.

It is unclear to what extent client misunderstanding in the somewhat unique circumstances of

—client having no interest in the funds,

—predetermined use of funds,

—no decision to be made by client,

—no financial harm to the client resulting from failure to explain more fully,

—all explanations by the lawyer being truthful,

—lawyer could reasonably believe that client would understand the benefit from explanations that were made,

—lawyer standing ready to make further explanation when called upon,

—lawyer's actions not "intentionally wrongful," and not found to be negligent or done in bad faith,

exposes the profession or the courts to obloquy, contempt, censure or reproach.

A rule imposing a duty of precedent full explanation could advance the interests of the profession only in respect to those clients served by a lawyer who would not make such explanation absent the imposition of such a duty, and of these clients only those who would be satisfied by a precedent explanation but not a subsequent explanation or those who, although they misunderstand the use of the funds, would fail to ask for an explanation, and of both groups of clients only those who would, because of such a misunderstanding with a lawyer, hold the profession or the courts up to obloquy, contempt, censure or reproach.

It is unclear how many clients having the information that Sebright had would nevertheless misunderstand, and how many of these would fail to obtain from their lawyers precedent full explanations were it not for the imposition of this duty and would have their understanding advanced by a precedent full explanation but not a subsequent

explanation; or how many clients who misunderstand the use of the funds, would, despite that misunderstanding, fail to ask for an explanation and whose understanding would be advanced by a precedent full explanation; or how many who have such a misunderstanding with a lawyer would hold the profession or the courts up to obloquy, contempt, censure or reproach.

The affirmative duty imposed by the Court requires lawyers to formalize their communications with their clients in an attempt to assure that the client understands, although the lawyer already reasonably believes the client understands, and, indeed, the client should be able to understand without further explanation.

The panel assessed Sebright's understanding under an objective standard speaking of "reasonable misunderstanding and disapproval" by him. This Court seems to apply a subjective standard, stating that the panel "was entitled to conclude that Mr. Sebright did not understand", and that the panel found that "Mr. Sebright did not understand". It would thus appear that even if, in the application of an objective standard, the client's misunderstanding is not reasonable, nonetheless the lawyer may have failed in his responsibility of precedent full explanation "to preclude" client misunderstanding if the particular client did not understand.

As the affirmative duty is stated, it would be no defense that the lawyer represented his client competently and diligently with integrity and in good faith and served his client's interests and did not depart from that goal. Indeed, even if the lawyer proves that he did not act under protective cover of his professional expertise and the letter of the law, and that there was no artifice or sharp

dealing, and that he did not seek to serve his own purposes or put personal gain ahead of his client's interests, the failure to have made precedent full explanation may be his nemesis.

In the instant case, although Silverman made full disclosure of all the relevant facts, and—even though Sebright was found to have reasonably misunderstood—a reasonable businessman could have. perceived the benefit that Silverman derived, and there is no finding of bad faith, negligence or incompetence, the Court holds that he nevertheless must be disciplined to protect the reputation of the profession.

Neither the panel nor this Court explains the connection between Silverman's omission to explain the benefit and the unproven assumption that the reputation of the profession has been exposed to damage by the absence of precedent full explanation. The panel and this Court ignore the record which indicates that the cause of Sebright's displeasure with Silverman was not his failure to make precedent full explanation of what Sebright could readily have perceived, but, rather, his loss of confidence in Silverman in regard to the tax matter and the events which followed.

While Sebright has a sense of grievance and may feel somewhat vindicated by the action of the panel and of the Grievance Board and this Court sustaining discipline, the cause of his grievance was not Silverman's failure to make precedent full explanation. It was, rather, his belief that Silverman had not handled the tax matter correctly, that the $1,591.21 belonged or should belong to him and that Silverman had not pressed the collection of the Fair indebtedness competently. Sebright was frustrated by his inability to obtain representation from members of the profession or

action by governmental authority to right his grievance. So while Sebright had a sense of grievance and a poor opinion of Silverman and may have also had a poor opinion of the profession for not righting his mistaken grievance, the absence of precedent full explanation, for which Silverman is being disciplined, was not a cause in fact of whatever obloquy, contempt, censure or reproach of the profession or of the courts resulted.

Silverman thus is not only being disciplined for something which was not covered by the complaint, he is being disciplined for a result which was not caused by the fault attributed by the panel and this Court to him.

It is also significant that, at least to my knowledge, this is the first time it has been held, in an opinion of this Court, that a lawyer has such an affirmative duty of explanation—not merely to protect the client's interests competently, diligently and honestly, but to avoid his "misunderstanding" and consequent harm or embarrassment to the reputation of the profession. It would be more appropriate for the Court to give this new rule prospective effect and to simply instruct (or, possibly, caution) Silverman that he should conduct himself in accordance with this rule as must other members of the profession.

I am persuaded from Silverman's testimony that he is a respectful and respectable member of the State Bar and would observe any such instruction or cautioning punctiliously. There is no need to impose any discipline in this case.

While a reprimand is the lightest form of discipline that can be imposed by a panel, it is nonetheless an embarrassment which no lawyer would suffer if he could avoid it. The Court acts properly in reducing the discipline from 30 days' suspension

to a reprimand. It has not gone far enough. The discipline should be eliminated altogether.

I would vacate the order of the board and dismiss the complaint.

KAVANAGH and FITZGERALD, JJ., concurred with LEVIN, J.