# Order

**Michigan Supreme Court**
**Lansing, Michigan**

April 16, 2010

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

140079
140081

GRIEVANCE ADMINISTRATOR,
      Petitioner-Appellant,

v

SHELDON L. MILLER,
      Respondent-Appellee.

SC: 140079
ADB: 06-186-GA

_____/

GRIEVANCE ADMINISTRATOR,
      Petitioner-Appellee,

v

SHELDON L. MILLER,
      Respondent-Appellee.

SC: 140081
ADB: 06-186-GA

_____

WAYNE ALARIE and RICHARD MARTIN,
      Complainants-Appellants.

_____/

On order of the Court, the applications for leave to appeal the October 30, 2009 order of the Attorney Discipline Board are considered, and they are DENIED, there being no majority in favor of granting leave to appeal.

WEAVER, J., would grant the applications for leave to appeal.

CORRIGAN, J. (*dissenting*).

I dissent from this Court's denial of leave to appeal the order of the Attorney Discipline Board (ADB) vacating the hearing panel's order of reprimand. The hearing panel determined that respondent Sheldon L. Miller violated MRPC 1.4(b) by failing to

inform complainants, his clients, who primarily asserted that they had been wrongfully discharged, that the trial court had recently dismissed one of the plaintiffs' claims, a ruling that was adverse to the clients' interests. Despite the three-member panel's unanimous determination[1] that Miller's conduct warrants disciplinary action and the Grievance Administrator's persuasive argument that Miller committed serious misconduct, this Court cannot muster a majority in favor of reviewing the ADB's decision to vacate the panel's order of reprimand. In so doing, this Court allows Miller's major ethical failures to escape punishment. Because serious misconduct apparently occurred, I would grant the applications for leave to appeal.

## I. INTRODUCTION

During the 1980s, Miller represented numerous individual plaintiffs in a lawsuit against Auto Club Insurance Association (AAA). The plaintiffs included both current and former AAA employees. The lawsuit included a claim on behalf of all plaintiffs that AAA improperly changed the method of compensation from a seven percent commission system to a unit-based system. It also asserted wrongful discharge on behalf of some former employees. Miller filed several amended complaints, each adding additional plaintiffs, until the total reached 150-200 plaintiffs. The Grievance Administrator's complaint against Miller alleged misconduct in Miller's representation of the complainants, Richard Martin (now deceased), Wayne Alarie, Donald Durecki, and James Dziadziola, who were part of a smaller group of former employees. The complaint alleged that Miller failed to inform complainants of an adverse ruling just before they joined the lawsuit, agreed to stay the wrongful discharge claims without their knowledge, and essentially prioritized the seven percent compensation claim while continuously failing to provide the complainants with sufficient information to allow them to make informed decisions about the representation. The complaint alleged that this conduct violated several provisions of the Michigan Rules of Professional Responsibility.

This Court does complainants, the hearing panel, and the public a major disservice by failing to review this matter further and allowing Miller to escape without any sanction. The record reveals that Miller failed to inform the complainants of the earlier adverse ruling because he believed it was not important to do so. Miller unquestionably prioritized the seven percent commission claim over the wrongful discharge claim. Complainants maintain that Miller knew that they were more concerned about pursuing their wrongful discharge claims. Complainants believed for years that Miller was pursuing their wrongful discharge claims when those claims had been stayed. Miller gave inconsistent answers in response to his clients' repeated requests for information about the lawsuit. Indeed, Miller apparently forgot that the lawsuit ever included

---

[1] The panel consisted of attorneys Samuel I. Bernstein, Thomas C. Simpson, and David F. Zuppke.

wrongful discharge claims. After listening to hours of testimony and posing questions to the witnesses, the hearing panel concluded that Miller's conduct warranted a reprimand.

The ADB's decision to vacate the panel's order of reprimand is highly questionable because an attorney's duty to communicate with clients clearly existed before MRPC 1.4(b) was enacted in 1988. In dismissing on this ground, the ADB erroneously relied on criminal procedure standards instead of notice standards governing civil cases.

Moreover, the record warrants this Court's plenary consideration of the Grievance Administrator's allegations that Miller's post-1988 conduct violated MRPC 1.4(b) and additional provisions of the Michigan Rules of Professional Responsibility.

## II. THE UNDERLYING LAWSUIT AND THE MALPRACTICE ACTIONS

Miller filed the initial complaint in *Dumas et al v Auto Club Ins Ass'n*, Wayne Circuit Court No. 83-316603-CK[2] in 1983 with three plaintiffs: Richard Dumas, Lynn McBride, and Eugene Pasko. The complaint included several counts including breach of contract and violation of the Elliot Larsen Civil Rights Act. Plaintiffs alleged that AAA breached its employment contract with the plaintiffs by changing the system of compensation, including replacing the previous guarantee of a seven percent commission for renewal policies, and instituting new minimum production standards ("quotas") for new policies. The Elliot Larsen claim alleged that the change in the compensation

---

[2] The lengthy procedural history of the underlying *Dumas* case is set forth in detail in *Dumas v Auto Club Ins Ass'n*, unpublished opinion per curiam of the Court of Appeals, issued April 14, 2000 (Docket No. 208617). In the recent case of *Dumas v Miller*, unpublished opinion per curiam of the Court of Appeals, issued March 30, 2010 (Docket Nos. 279149, 286342, 286343, 286344, 287143), the Court of Appeals resolved the only remaining issue in the *Dumas* case: a fee dispute between Miller and attorney Theodore S. Andris, who later substituted for Miller in representing some of the plaintiffs. The Court of Appeals also addressed several consolidated legal malpractice actions arising out of Miller's representation of current and former AAA employees. It affirmed the trial court's grant of summary disposition in favor of defendants (Miller, his law firm and in Docket No. 286344 David Ravid, Miller's former associate) in Docket Nos. 286343, 286344, and 286342, and reversed the trial court's denial of defendants' motion for summary disposition in Docket No. 287143.

Docket No. 279149 concerns essentially the same allegations of misconduct that were presented to the ADB. The Court of Appeals relied in part on the decision of the ADB in concluding that the trial court did not err in finding, after conducting an evidentiary hearing, that Miller did not engage in disciplinable misconduct with respect to his representation of the *Dumas* plaintiffs.

system had a disparate impact on older employees and was intentionally designed to force older employees to terminate their employment with AAA, accept employment with AAA at a lower salary, "or become discharged," and that the plaintiffs "actually were either discharged, terminated their own employments, or accepted employment with [AAA] at their lower yearly salary." Most of the plaintiffs were still employed by AAA and were pursuing claims related to the compensation system. A smaller group of plaintiffs, including complainants, were no longer employed by AAA. These plaintiffs were also claiming wrongful discharge. Although Miller initially contemplated a class action, the action was not certified. Instead, individual plaintiffs were added by several amended complaints. According to testimony before the panel, Miller eventually represented as many as 150 to 200 plaintiffs.

In January 1984, before the complainants joined the lawsuit, Wayne Circuit Judge John Hausner dismissed a portion of the complaint pertaining to the breach of contract claims. Neither Miller nor his associates told complainants about this partial dismissal before they joined the lawsuit.

In 1985, Miller and his associates and the attorneys for AAA agreed to proceed with the seven percent commission claims and to stay the issues relating to production standards, which included the wrongful discharge claims. On May 8, 1985, the court entered an "Order Regarding Plaintiffs' Motion to Establish Manageable Parameters for Complex Litigation," which bifurcated any trial on the issues of liability and damages for the claims pertaining to the changes in the commission system, including claims for breach of contract and unjust enrichment under *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579 (1980), and stayed "in their entirety" plaintiffs' claims regarding the quota production standards, which included claims of age discrimination and wrongful discharge.

Complainants claim that they were never informed about the stay of proceedings. Although proceedings including several appeals to the Court of Appeals and this Court continued in the *Dumas* case over the next several years, the wrongful discharge claims remained subject to the stay.

In 1986, the trial court granted AAA's motion for summary disposition and dismissed the seven percent commission issue from the lawsuit. The order was designated as a "final" order even though it did not dispose of the wrongful discharge claims and the case was removed from the circuit court's docket. Appeals followed. During this time, the complainants believed their wrongful discharge claims were pending and sought information from Miller on several occasions. In 1988, Miller won partial reversal of the trial court's summary disposition order in the Court of Appeals, *Dumas v Auto Club Ins Ass'n*, 168 Mich App 619 (1988), but in *Dumas v Auto Club Ins Ass'n*, 437 Mich 521 (1991), this Court reversed the Court of Appeals decision that plaintiffs could maintain their action for breach of contract and unjust enrichment against

AAA. In November 1991, Miller held a meeting to inform his clients of this Court's decision.

After some of Miller's clients retained attorneys to file legal malpractice actions against Miller, Miller began seeking to have *Dumas* reinstated for the clients who were claiming wrongful discharge because it did not appear that this Court's 1991 decision specifically addressed that claim. Then, in a 1993 discovery deposition of one of Miller's former associates, the 1985 stay came to light. The stay thereafter became the basis of Miller's efforts to reinstate the wrongful discharge claim.

In 1991, Martin and Alarie retained attorney Theodore S. Andris to explore the possibility of suing Miller for legal malpractice. Miller offered to allow Andris to substitute as attorney for Martin and Alarie. Andris declined. He wanted Miller to first succeed in having his clients' wrongful discharge claims reinstated. Miller apparently contended that the claims of Martin and Alarie had no merit and that any malpractice claim against him would be frivolous. In 1992, Andris filed a malpractice action against Miller on behalf of Martin and Alarie. Attorney John Mason filed a malpractice action against Miller on Durecki's behalf.

In October 1992, Andris filed a limited appearance in the *Dumas* lawsuit for the purpose of determining the status of the case. Attorney Roger Wardle, Miller's attorney in the malpractice action, concurred in the motion. Judge Hauser initially determined that all of the issues in the case had been resolved, and ruled on remand that although the 1986 order granting summary disposition did not dispose of the plaintiffs' "'quota' age discrimination claims," plaintiffs had abandoned those claims.

In 1996, the *Dumas* case was reassigned to Wayne Circuit Judge William Giovan, who handled further trial court proceedings on whether to grant a scheduling order for proceedings on the quota age discrimination claim or enter an order disposing of the case. Judge Giovan concluded that no court or person intended for the case to be dismissed, and granted the motion for entry of a scheduling order on April 25, 1996. The order noted that the court's ruling "also necessarily contemplates that the stay of proceedings entered . . . on May 8, 1985, is hereby dissolved." More appeals ensued, but Judge Giovan's decision to allow the wrongful discharge claims to proceed was ultimately upheld.

Miller's representation of Martin and Alarie in the *Dumas* case continued until Andris entered a substitution of counsel on their behalf in 2002. AAA settled with Martin and Alarie for $300,000 each. Attorney John Mason took over representation of some of the other *Dumas* plaintiffs, including complainant Durecki. Mason took his clients' claims to trial and, in 2002, a jury returned a verdict of no-cause of action. Several of the original plaintiffs, including complainant Dziadziola, continued to be represented by Miller. Dziadziola ultimately accepted AAA's offer to settle for $30,000.

In 2004, Andris filed a malpractice action against Miller on behalf of Dziadziola and three other plaintiffs who accepted similar settlement offers. As noted, the Court of Appeals recently addressed the consolidated malpractice actions. *Dumas v Miller*, unpublished opinion per curiam of the Court of Appeals, issued March 30, 2010 (Docket Nos. 279149, 286342, 286343, 286344, 287143).

## III. PROCEEDINGS BEFORE TRI-COUNTY HEARING PANEL #64

Complainants also sought disciplinary action against Miller. In 2006, the Grievance Administrator filed a complaint before the Attorney Discipline Board alleging that Miller's agreement to stay the wrongful discharge claims while proceeding with the claims related to the compensation system effectively prioritized the claims of the plaintiffs who were still employed by AAA without the knowledge of the plaintiffs who had been discharged. The complaint alleged that Miller failed to obtain authority or approval from complainants to stay their wrongful discharge claim and failed to inform them of the stay. It alleged that in response to complainants' repeated inquiries about the status of the case, Miller misrepresented to them that their claims were on appeal, even though the wrongful discharge claim had been stayed. The Grievance Administrator alleged violations of several sections of the Michigan Rules of Professional Conduct.

The panel held a three-day hearing on June 25, 2007, November 6, 2007, and March 5, 2008, and issued its report on April 8, 2008. The panel unanimously found that that the Grievance Administrator had proven by a preponderance of the evidence that Miller had failed to explain a matter to the extent reasonably necessary to permit his clients to make informed decisions in violation of MRPC 1.4(b). In particular, the panel found that Miller was obligated to explain to complainants the implications of joining the "large group" action instead of initiating independent actions. It also found that, by failing to inform complainants of the adverse ruling that occurred just before they joined the lawsuit, Miller deprived them "of the opportunity to file an independent action which likely would have been assigned to a different Judge where a different ruling of the dismissed legal issues might have occurred." The panel concluded that the Grievance Administrator had not proven by a preponderance of the evidence that Miller violated other sections of the MRPCs. The panel thereafter unanimously concluded that Miller should be reprimanded and issued an order of reprimand.

## IV. THE ATTORNEY DISCIPLINE BOARD'S RULING

Complainants appealed to the ADB. The ADB granted Miller's motion to consider his delayed cross-petition for review. In his cross-petition, Miller argued for the first time that MRPC 1.4(b) did not come into effect until 1988 and that the Grievance Administrator had not pleaded a violation of the Code of Professional Responsibility which was in effect in 1984 and 1985. After a hearing, the ADB issued an order on October 30, 2009 vacating the panel's order of reprimand. The ADB affirmed the panel's

findings of fact, but vacated the order of reprimand. It reasoned that Miller's conduct during the relevant period 1984 through 1985 was not in violation of MRPC 1.4(b) as alleged in the complaint because MRPC 1.4(b) did not become effective until October 1, 1988 and the complaint did not charge any violation under Michigan's former Code of Professional Responsibility.

## V. AN ATTORNEY'S DUTY TO COMMUNICATE WITH CLIENTS

I would grant complainants and the Grievance Administrator leave to appeal the ADB's decision. An attorney's duty to communicate with clients plainly existed before MRPC 1.4(b) was enacted. "[T]he failure to disclose all relevant facts and information known by an attorney to his or her client has traditionally been regarded as breach of an attorney's ethical obligation." *State Bar Grievance Administrator v Estes*, 390 Mich 585, 600 (1973), citing *Kukla v Perry*, 361 Mich 311, 317 (1960); *Storm v Eldridge*, 336 Mich 424, 435 (1953). In *Joos v Auto Owners Ins Co*, 94 Mich App 419, 424 (1979), the Court of Appeals held that "an attorney has, as a matter of law, a duty to disclose and discuss with his or her client good faith offers to settle." Moreover, the duty of reasonable communication imposed by MRPC 1.4(b) was embodied in the Michigan Code of Professional Responsibility. DR 6-101(A)(3) provided that "[a] lawyer shall not . . . [n]eglect a legal matter entrusted to him." DR 7-101(A)(2) and (3) provided that "[a] lawyer shall not intentionally . . . [f]ail to carry out a contract of employment entered into with a client for professional services . . ." or "[p]rejudice or damage his client during the course of the professional relationship . . ."

## VI. SUFFICIENCY OF THE COMPLAINT

Moreover, the complaint contained sufficient factual details to notify Miller of the nature of the allegations against him. While Miller likens a proceeding before the ADB to a criminal proceeding, the Grievance Administrator points out that, in general, "the rules governing practice and procedure in a nonjury civil action apply to a proceeding before a hearing panel." MCR 9.115(A). "Pleadings must conform as nearly as practicable to the requirements of subchapter 2.100." *Id*. Under the general rules of pleading in a civil action, a pleading must contain "[a] statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend" and "[a] demand for judgment for the relief that the pleader seeks." MCR 2.111(B)(1), (2). The purpose of a complaint in a civil action is to state a cause of action and to allege facts with "'sufficient particularity to reasonably inform the defendant of the nature of the cause of action.'" *Steed v Covey*, 355 Mich. 504, 510 (1959), quoting 19 Michigan Law and Practice, Pleading § 8, p12. "'In general, the complaint or petition is sufficient if its allegations state facts upon which the plaintiff relies for a recovery, and if it adequately advises the defendant of the charge so as to

enable him to prepare his defense.'" *Id*. at 511, quoting 41 Am Jur, Pleading, § 77, pp 343-345.

Moreover, MCR 9.115(B), which applies specifically to disciplinary proceedings further provides that, "Except as provided by MCR 9.120,[3] a complaint setting forth the *facts* of the alleged misconduct begins proceedings before a hearing panel." (Emphasis added.) In contrast, the rules of criminal procedure define the complaint as "a written accusation that a named or described person has committed *a specified criminal offense*" and require the complaint to "include the substance of the accusation against the accused and *the name and statutory citation of the offense*." MCR 6.101(A). And, unlike in a criminal case, "[a] default, with the same effect as a default in a civil action, may enter against a respondent [in a disciplinary proceeding] who fails within the time permitted to file an answer admitting, denying, or explaining the complaint, or asserting the grounds for failing to do so." MCR 9.115(D)(2).

Because the rules of civil procedure apply to pleadings in a disciplinary action, and because the complaint thoroughly set forth the facts of the alleged misconduct, I believe we should grant leave to consider the correctness of the ADB's decision to vacate the panel's reprimand order on the sole basis of the Grievance Administrator's failure to plead a violation of the former Michigan Code of Professional Responsibility.

## VII. ADDITIONAL ALLEGED VIOLATIONS OF THE MICHIGAN RULES OF PROFESSIONAL RESPONSIBILITY

In addition to disputing the correctness of the ADB's decision because an attorney's duty to explain a matter to the extent reasonably necessary to permit the client to make informed decisions about the representation predated the enactment of MRPC 1.4(b) in 1988, the Grievance Administrator points out that Miller's duty to keep his clients informed continued until at least 1991, and until 2002 with respect to Dziadziola. I believe the record, as discussed below, supports the Grievance Administrator's position. In addition, the Grievance Administrator argues that the record supports additional findings of misconduct. Specifically, the Grievance Administrator alleges that Miller handled a legal matter that he was not competent to handle in violation of MRPC 1.1(a); neglected a legal matter entrusted to him in violation of MRPC 1.1(c); failed to seek the complainants' lawful objectives in violation of MRPC 1.2(a); limited the objectives of the representation without complainants' consent in violation of MRPC 1.2.(b); failed to act with reasonable diligence in violation of MRPC 1.3; failed to make reasonable efforts to expedite litigation in violation of MRPC 3.2; failed to keep complainants reasonably informed about the status of the matter and to promptly comply with reasonable requests

---

[3] MCR 9.120 applies when the attorney has been convicted of a criminal offense. It requires, among other things, that the Grievance Administrator be notified of the conviction within 14 days.

for information in violation of MRPC 1.4(a); materially limited his representation of complainants by also representing the larger group of plaintiffs in violation of MRPC 1.7(b); and engaged in misrepresentation in violation of MCPC 8.4(b) by repeatedly misrepresenting to Martin and Alarie that they did not have wrongful discharge claims. The Grievance Administrator also claims that this alleged misrepresentation was conduct that exposed the legal profession to obloquy, contempt, censure, or reproach in violation of MCR 9.104(A)(2), and was conduct that was contrary to justice, ethics, or honesty in violation of MCR 9.104(A)(3).

## VIII. RECORD SUPPORT FOR THE ALLEGATIONS OF MISCONDUCT

In my view, the record supports the Grievance Administrator's and the complainants' argument that significant misconduct occurred. Miller's apparent failures began at the time complainants decided to retain Miller with his failure to inform them of the earlier adverse ruling and to explain to them the implications of joining a larger group of plaintiffs who were still employed by AAA. Miller admitted that when the complainants first approached him in 1984, the breach of contract claims for both minimum production standards and the change in compensation had been dismissed. Transcript of Panel Hearing, March 5, 2008, at 691. Miller testified that members of his staff probably first interviewed complainants but agreed that no one would have told them about the dismissal. Miller felt it was not important to tell them because the most important part of the case was the seven percent compensation issue and because he had a right to appeal the trial court's decision. *Id*. at 688, 695.

Miller's questionable conduct continued when he agreed to stay part of the case yet allegedly failed to inform complainants of the stay at the time it was entered. Miller apparently agreed to the stay for strategic reasons. He believed that resolution of the seven percent claims first would benefit even those plaintiffs who no longer worked at AAA. Complainants, however, maintained that they made it clear to Miller that their priority was the wrongful discharge claims. At the time the stay was entered and in the years that followed, Miller seemingly failed to appropriately communicate with the smaller group of plaintiffs who had been discharged, despite their repeated requests for information.

Miller testified before the panel that he and AAA's counsel had agreed that the case should be bifurcated and part of the case stayed. *Id*. at 726. AAA apparently refused to discuss settlement until the issue regarding the change in the compensation system had been resolved. *Id*. at 724. Miller testified that his rationale behind agreeing to the stay was that the seven percent issue should be pursued first because the most important issue for the plaintiffs who had lost their jobs was the amount of damages to which they would be entitled. *Id*. at 720. Miller believed that he would be able to get a larger amount in damages for both the plaintiffs who were still employed by AAA and those who had lost their jobs if he was able to prevail on the seven percent issue because

AAA had cut pay by as much as 40 percent. *Id*. at 720-721. Miller's former associate David Ravid likewise testified that the attorneys for both sides agreed that the "biggest single issue and the only common issue" was the seven percent compensation claim, so they agreed to the stay in an effort to "streamline" the case. Transcript of Panel Hearing, November 6, 2007, at 533-534. Miller acknowledged at the hearing that, at the time he agreed to the stay, he had no information about the amount of the complainants' compensation under the old versus new compensation systems, so he did not actually know how much greater their damages would have been if the seven percent compensation claim were proven. Transcript of Panel Hearing, March 5, 2008, at 731-732. Miller was also asked what he would have done if any of the plaintiffs who no longer worked at AAA approached him and indicated that they were more concerned about having lost their jobs and agreed to damages calculated using the new compensation system. *Id*. at 730. Miller replied, "If somebody came and told me that specifically and I was sure that they understood they would be putting in damages at a substantially lower level, absolutely, I would have done what they wanted." *Id*. at 730-731.

Yet according to the complainants, their primary concern, which they made clear to Miller and his staff, was pursuing the constructive discharge claims. Alarie testified that he and Martin met with Miller and Bill Stevenson of the Miller law firm. Transcript of Panel Hearing, June 25, 2007, at 62. Alarie said that he went to see Miller because he felt he had been forced out of AAA because of their practices. *Id*. at 62-63. Alarie testified, "once I presented my case to him, he said that I had a classic case of constructive discharge and that he would add us, add me to the case he already had, and that would expedite my case coming to light." *Id*. at 63. Alarie said that he understood that the *Dumas* case was about the seven percent commission claim and that he agreed that Miller could make that claim for him too "[i]f it was going to expedite our case." *Id*. at 65. Alarie testified that he reiterated to Miller that he was not currently employed with AAA. He believed Miller understood that his primary purpose in retaining Miller was to pursue a constructive discharge claim. *Id*. at 65-66. Dziadziola similarly testified that his primary concern, which he communicated to Miller, was that he "had planned on staying with [AAA] all my career, and now it was taken away." *Id*. at 173. He said that Miller advised joining the lawsuit that was already underway. *Id*. at 171-174. Durecki testified that he retained Miller because Miller "agreed to represent me for what he told me was wrongful discharge due to age." *Id*. at 275. Durecki testified he wanted his job back and that Miller knew that because Durecki asked him about it at every meeting. *Id*. 283-284.

Given the complainants' apparent focus on their wrongful discharge claims, they should have been informed about the stay. Miller testified that while he had no recollection of informing his clients about the stay, he held a meeting with all of the clients after every major ruling, and that he was confident he held a meeting after the stay was entered. Transcript of Panel Hearing, March 5, 2008, at 727-728. It is undisputed that Miller and his associates held several meetings for all of the plaintiffs to inform them

of developments in the lawsuit. Ravid also did not recall informing the plaintiffs of the stay, but was "quite confident" that they were told about the stay. Transcript of Panel Hearing, November 6, 2007, at 536-537. Miller acknowledged, however, that he did not write, telephone or meet separately with the clients most directly affected by the stay. Transcript of Panel Hearing, March 5, 2008, at 729-730. It is also not clear whether any provision was made for informing those clients who could not attend the meetings. Miller testified that "[a]s far as I could tell without taking attendance, I thought just about everybody attended every meeting," but acknowledged the possibility that some clients may have never attended a meeting. *Id.* at 882-883. Panelist Bernstein then asked, "Can I ask you why you didn't every three or four or five or six months didn't just write a mass letter to everyone indicating what was transpiring?" *Id.* at 883. Miller responded:

> Most of the time nothing was going on. We did write letters when there were settlement proposals, which was of importance to them, "Please come in." Everyone came in personally, I discussed their case and the offer the AAA made to their case.
>
> Other than that, they got personal letters telling them to attend the meetings. I would assume that if they couldn't attend the meetings – maybe I'm wrong – if [sic] I could assume that if they don't attend the meeting and they want to know what's going on, they pick up the phone, okay? Nobody ever called me and said, "What's going on that I don't know, or anything like that. So as far as I knew, everybody was fully informed of everything. [*Id.*]

The complainants insisted that they never learned of the stay, either at the meetings or by other means. Transcript of Panel Hearing, June 25, 2007, at 73-76, 180-181, 183-185, 284, 290. Durecki testified that he attended every meeting about which he received a notice. *Id.* at 290-291. Durecki would sometimes ask Miller about the wrongful discharge claims at the large group meetings but that he never learned of the stay until sometime in the 1990s when attorney John Mason told him about it. *Id.* at 291. Fran Stocker, who was one of the Dumas plaintiffs still employed by AAA during the lawsuit, also testified that she attended most of the meetings and did not recall any discussion of any part of the case being stayed. Transcript of Panel Hearing November 6, 2007 at 426-427.

Over several years, complainants requested information about the lawsuit. In a February 17, 1985 letter, Martin wrote to Miller that he had called Miller's office twice in November 1984 and left a message asking Miller to return his calls. Miller did not respond. Martin hoped for answers to his questions. Martin continued:

> In reading an article in the Grand Rapids paper about Bruce Farrell's lawsuit and his award, I find that you were quoted as saying that all of your

clients are still employed at AAA.  Mr. Miller, you have three clients in Bay City who are not employees of AAA.  Are we not still part of your lawsuit?

Could you please give me a brief synopsis of our suit as to where it stands presently?   What does the award in Grand Rapids mean to our case?  Are we still sometime from a trial?  Has the company (AAA) offered any type of settlement? [Complainant's Amended Brief in Support of Petition for Review of Order of Tri-County Hearing Panel #64, Exhibit B.]

Attorney David Ravid apparently responded on Miller's behalf that the Farrell case had little meaning to the Dumas case but also stated that all plaintiffs named in the suit continued to be a part of the suit whether or not they were currently employed by AAA. Transcript of Panel Hearing, March 5, 2008, at 715.

On August 30, 1990, Martin wrote to Miller stating that he had previously declined to accept AAA's settlement offer.  Martin stated that he had "no intention of accepting such a ridiculous amount."   Martin wrote that Miller's reply to his earlier correspondence did not address his "concern as to why I would not receive a settlement based on the merits of the whole suit and not just the unit difference." Martin continued:  Again, I ask if you have approached AAA for a settlement on the whole case?  Can I file a suit individually or must I remain part of the Dumas case?  What is the status of our case with the courts, including the Michigan Supreme Court?

The reason for my concern is that there are individuals from this area that are with other attorneys that have reached settlement with AAA. [Complainants' Application, Exhibit CC, Petitioners' Exhibit 30.]

Miller's September 5, 1990 response acknowledged that Martin had a wrongful discharge claim.  The letter stated that negotiations between Miller and AAA had "hit into a brick wall," but explained that they had previously attempted to agree on a damages formula.  "However, in a case such as yours, where there is a claim for wrongful discharge, the formula would not be fair, as it would be applied to you."  Miller explained that if they were able to prove wrongful discharge, "the amount of damage you would have suffered would be far, far greater than the amount AAA would be willing to pay voluntarily."  Complainant's Amended Brief in Support of Petition for Review of Order of Tri-County Hearing Panel #64, Exhibit I.

An internal memorandum dated January 11, 1991 from attorney Richard Shaw to Miller responded to Miller's January 10, 1991 query whether the firm was pursuing a cause of action in connection with the discharge of several of the *Dumas* plaintiffs.  Shaw wrote, "It is most unclear to me whether issues such as quotas, demotion, and discharge

are still alive in the trial court. . . . If they are, we should be actively adjudicating those claims." Complainant's Amended Brief in Support of Petition for Review of Order of Tri-County Hearing Panel #64, Exhibit J. At the hearing, Miller admitted he did nothing in response to this memorandum, but said "I was in the Supreme Court. What could I do? . . . You can't just take away the case and bring it back." Miller testified that he knew the case was "still alive" on the wrongful discharge claims all along and knew that part of the case had not gone forward, but admitted that he may have forgotten about the actual stay order. Transcript of Panel Hearing, March 5, 2008, at 757-759.

In a January 30, 1991 letter signed by both, Martin and Alarie reiterated their rejection of AAA's settlement offer: "we reject any settlement of this nature based on the unit discrepancy and wish our settlement to be based on the merits of the whole case. We do not understand how the direction of our case has been narrowed to the point of unit pay." Martin and Alarie asked, "Why is AAA eager to settle for much larger amounts with other former employees?" Complainants' Application, Exhibit DD, Petitioners' Exhibit 33.

In a March 22, 1991 letter, Miller advised Martin and Alarie that "our lawsuit which was filed in 1983 did allege age discrimination and breach of the employment contract as they pertained to the payment of 7% commissioners on new and renewal business. . . . That lawsuit does not contain any claim that anybody was wrongfully discharged." Complainant's Amended Brief in Support of Petition for Review of Order of Tri-County Hearing Panel #64, Exhibit K. At the hearing, Miller testified concerning this letter, "I made a mistake in my wording." Transcript of Panel Hearing March 5, 2008, at 755-756. He admitted that the mistake had never been corrected because he was not aware of it until later. *Id*. at 756. Referring to the plaintiffs, Miller said, "They had copies of the lawsuit, so they knew what the lawsuit said." *Id*.

In November 1991, Miller held a meeting to discuss this Court's 1991 decision reinstating Judge Hausner's summary disposition order. The dialogue at the meeting suggests that Miller had forgotten about the wrongful discharge claims or that he had at least failed to keep the plaintiffs informed about the status of those claims. At the meeting, a plaintiff identified only as "Pasko" asked Miller what happened to the age discrimination claims. Miller replied that age discrimination "didn't apply" in *Dumas*:

> MILLER: . . . It didn't apply because the discrimination was not for anybody losing their job. Had you been fired, had you been fired, and they replaced you with a younger person, that would have at least been a claim for age discrimination.
>
> PASCO: But that's exactly what happened.

MILLER: Oh, wait, I'm not talk—I, no, wait . . . so we understand, I'm not talking about your individual, I'm talking about the <u>Dumas</u> case that was filed as a 7% commission case.

PASKO: Because I'm one of the originals, and I was the, was one of the one's forced out for early retirement and you said you had me covered. And that's age discrimination. That's unlawful discharge, harassment, whatever you want to call it.

MILLER: We sued for 7, for the breach of the 7% commissions.

PASKO: That's what you were suing for?

MILLER: Yeah. That's what we were suing for. Everybody there read the Complaint, everybody there has been to a hundred meetings, this is a 7% commission suit.

PASKO: Why through the years have you been telling me I've got a case then?

MILLER: I told everybody that I thought they had a case. I didn't tell anybody I didn't think they had a case. What do you think I spent all my time with it for? Do you think I did it because I liked it? I did it because we thought we had a case. And until the Supreme Court changed the law we did have a case.

PASKO: That 7% that you're talking about didn't mean I thing to me, and I left in '83.

MILLER: I understand.

PASKO: I was a full discharge. And you knew that. And you told me for the last 8 years that you had me protected.

MILLER: Okay.

* * *

PASKO: And I think there's guys in here that know about how many times I've asked you that in these meetings. [Complainant's Amended Brief in Support of Petition for Review of Order of Tri-County Hearing Panel #64, Exhibit L.]

Later, however, Miller did say that "[t]he only hope is for the 20 people," by which it is possible that he meant the smaller group of plaintiffs who were pursuing wrongful discharge claims. *Id*.

## IX. CONCLUSION

In my view, the record at least creates a question about whether Miller failed to fulfill his duties to the complainants as members of a smaller group of plaintiffs who sought to pursue wrongful discharge claims. The Grievance Administrator raises significant questions about the correctness of the ABD's decision to vacate the panel's order of reprimand, and persuasively argues that Miller violated a duty to communicate with his clients that pre-dated MRPC 1.4(b) and violated additional provisions of the Michigan Rules of Professional Misconduct. I also consider it significant that the panelists unanimously determined that Miller's conduct warranted a reprimand. The ADB found no flaw in the panel's factual determinations, but vacated the order of reprimand on the basis of what is, in my view, a very questionable legal conclusion. I would grant leave to consider the correctness of that ruling and to consider complainants' and the Grievance Administrator's argument that Miller engaged in additional misconduct.

MARKMAN, J., joins the statement of CORRIGAN, J.

YOUNG, J., not participating, because he was general counsel for AAA when a portion of the underlying litigation was pending.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

April 16, 2010

s0413

Clerk